# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

|  |  |  |
|---|---|---|
|  | ) |  |
| IN RE VOLCANO CORPORATION | ) | CONSOLIDATED |
| STOCKHOLDER LITIGATION | ) | C.A. NO. 10485-VCMR |

## OPINION

Date Submitted: March 15, 2016
Date Decided: June 30, 2016

Derrick B. Farrell and James R. Banko, FARUQI & FARUQI LLP, Wilmington, Delaware; Seth D. Rigrodsky, Brian D. Long, Gina M. Serra, and Jeremy J. Riley, RIGRODSKY & LONG, P.A., Wilmington, Delaware; Kent A. Bronson, Roy Shimon, and Christopher Schuyler, MILBERG LLP, New York, New York; Julia J. Sun, LEVI & KORSINSKY LLP, New York, New York; Juan E. Monteverde, FARUQI & FARUQI LLP, New York, New York; *Attorneys for Plaintiffs Melvin Lax, Melissa Gordon, and Mohammed Munawar*.

William M. Lafferty, D. McKinley Measley, and Richard Li, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; Koji Fukumura and Peter Adams, COOLEY LLP, San Diego, California; *Attorneys for Defendants Kieran T. Gallahue, Lesley H. Howe, R. Scott Huennekens, Siddhartha Kadia, Alexis V. Lukianov, Ronald A. Matricaria, Leslie V. Norwalk, and Daniel J. Wolterman*.

Kevin G. Abrams, J. Peter Shindel, Jr., and Daniel R. Ciarrocki, ABRAMS & BAYLISS LLP, Wilmington, Delaware; Mitchell A. Lowenthal and Meredith Kotler, CLEARY GOTTLIEB STEEN & HAMILTON LLP, New York, New York; *Attorneys for Defendant Goldman, Sachs & Co.*

Raymond J. DiCamillo, J. Scott Pritchard, and Rachel E. Horn, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; Michael H. Steinberg and Edward E. Johnson, SULLIVAN & CROMWELL LLP, Los Angeles, California; *Attorneys for Nominal Defendant Volcano Corporation.*

**MONTGOMERY-REEVES, Vice Chancellor.**

The plaintiffs in this action are former public stockholders of a company that was acquired for $18 per share in an all-cash merger. Just five months prior, the target company had declined an offer of $24 per share from the same acquiror. After the companies announced the merger, the plaintiffs brought this action against the target company's board of directors and its financial advisor. The gist of the plaintiffs' complaint is that the board breached its fiduciary duties in approving the merger and the financial advisor, motivated by its own conflicts of interest, aided and abetted those breaches. Both the board and the financial advisor moved to dismiss the complaint under Court of Chancery Rule 12(b)(6).

The defendants argue, among other things, that stockholders representing a majority of the target company's outstanding shares expressed their fully informed, uncoerced, disinterested approval of the merger. As such, according to the defendants, the business judgment rule standard of review irrebuttably applies to the plaintiffs' allegations and insulates the merger from a challenge on any ground other than waste, which the plaintiffs fail to allege. As further explained in this Opinion, I agree with the defendants and, therefore, grant their motions to dismiss under Rule 12(b)(6).

1

## I.    BACKGROUND[1]

### A.    Parties

Plaintiffs Melvin Lax, Melissa Gordon, and Mohammed Munawar ("Plaintiffs") were common stockholders of Volcano Corporation ("Volcano" or the "Company") at all relevant times.

Defendants R. Scott Huennekens, Kieran T. Gallahue, Lesley H. Howe, Siddhartha Kadia, Alexis V. Lukianov, Ronald A. Matricaria, Leslie V. Norwalk, and Daniel J. Wolterman were members of Volcano's board of directors (the "Board") at the time of the complained-of merger. Huennekens also served as the Company's President and Chief Executive Officer ("CEO").

Defendant Goldman, Sachs & Co. ("Goldman") is a New York-based investment banking firm. Goldman served as Volcano's financial advisor in

---

[1]    The facts are drawn from the well-pled allegations of the plaintiffs' Verified Consolidated Amended Class Action Complaint (the "Complaint"). Further, on a motion to dismiss under Rule 12(b)(6), the Court "draw[s] all reasonable inferences in the plaintiff's favor." *Norton v. K-Sea Transp. P'rs L.P.*, 67 A.3d 354, 360 (Del. 2013). Those allegations and inferences, as well as the facts drawn from the documents incorporated into the Complaint by reference, are assumed true for purposes of the defendants' motions to dismiss. *In re Morton's Rest. Gp., Inc. S'holders Litig.*, 74 A.3d 656, 659 n.3 (Del. Ch. 2013) ("To be incorporated by reference, the complaint must make a clear, definite and substantial reference to the documents." (quoting *DeLuca v. AccessIT Gp., Inc.*, 659 F. Supp. 2d 54, 60 (S.D.N.Y. 2010))). Notably, the documents incorporated by reference include Volcano's Schedule 14D-9 Solicitation/Recommendation Statement filed with the U.S. Securities and Exchange Commission (the "SEC") on December 30, 2014 (the "Recommendation Statement"). *See* Trans. Aff. of Richard Li ("Li Aff."), Ex. A ("Recommendation Statement").

connection with the merger. The Board and Goldman, together, are referred to as "Defendants."

Nominal Defendant Volcano was a San Diego-based Delaware corporation and "the global leader in intravascular imaging for coronary and peripheral applications[] and physiology."[2] Volcano's shares were listed on the NASDAQ under the symbol "VOLC."[3]

Non-party Philips Holding USA Inc. is a Delaware corporation and a wholly-owned subsidiary of Koninklijke Philips, N.V. (together with Philips Holding USA Inc., "Philips").[4] Philips is an Amsterdam-based Dutch technology company that focuses on healthcare, consumer lifestyle, and lighting products. Philips's stock is listed on the New York Stock Exchange under the symbol PHG.

---

[2] Compl. ¶ 34.

[3] I note that, in one paragraph of the Complaint, Plaintiffs also allege that Volcano's stock was traded on the New York Stock Exchange rather than on the NASDAQ. Compl. ¶ 34. Because the press release announcing the merger, which is excerpted in the Complaint, only describes Volcano as being listed on NASDAQ, I assume that the reference to the New York Stock Exchange is an error. *See* Compl. ¶ 99.

[4] The Complaint originally named Philips and Clearwater Merger Sub, Inc. ("Merger Sub"), a wholly-owned subsidiary of Philips's that was created to effectuate the merger, as defendants. Philips and Merger Sub moved to dismiss the Complaint, and, in response to that motion, Plaintiffs voluntarily dismissed them from this action pursuant to Court of Chancery Rules 41(a)(1)(i) and 23. *See* Notice and Order of Voluntary Dismissal, Docket Item No. 49.

3

### B. Facts

#### 1. Volcano issues convertible notes and enters into hedge transactions with Goldman

In 2012, Volcano sought to raise funds through a convertible note offering. To that end, the Company entered into an underwriting agreement (the "Underwriting Agreement") with Goldman and J.P. Morgan Securities LLC ("J.P. Morgan" and, together with Goldman, the "Underwriters") on December 4, 2012. Pursuant to the Underwriting Agreement, Volcano agreed to sell $400 million of 1.75% Convertible Senior Notes due in 2017 (the "Convertible Notes") and, at the option of the Underwriters, up to an additional $60 million of those Convertible Notes. The Underwriters exercised that option on December 5, 2012 and issued the full $460 million of Convertible Notes (the "Convertible Note Issuance"). The Convertible Note Issuance closed on December 10, 2012.

The $460 million of Convertible Notes was convertible into approximately 14.01 million shares of Volcano common stock at $32.83 per share under the circumstances described in the Convertible Notes' indenture. Because the Board was concerned about the potentially dilutive effect on Volcano's common stockholders if the Convertible Notes' holders sought to exercise their conversion rights, the Company also entered into a series of hedging transactions with the

4

Underwriters[5] (the "Call Spread Transactions").  To mitigate that equity dilution risk, the Call Spread Transactions were intended to (1) increase the effective conversion premium and (2) reduce the effective dilution of the Convertible Note Issuance.

The Call Spread Transactions addressed these dual objectives through the two separate transactions between Volcano and the Underwriters that comprised the Call Spread Transactions.  In the first transaction, Volcano paid $78,085,344 to purchase from the Underwriters call options (the "Options") for 14.01 million shares of Volcano common stock at an initial strike price of $32.83 (the "Option Transaction").  Because the Option Transaction gave Volcano the ability to repurchase the same number of shares that the Convertible Notes could be converted into at a strike price equal to the conversion price of the Convertible Notes, Volcano could ensure that the total number of its shares outstanding would remain static.

In the second transaction, the Underwriters paid $46,683,206 to purchase from Volcano warrants (the "Warrants") for 14.01 million shares of Volcano common stock at an initial strike price of $37.59 (the "Warrant Transaction").  The

---

[5]     Volcano actually entered into the Call Spread Transactions with an affiliate of J.P. Morgan's—JP Morgan Chase Bank, National Association, London Branch.  That distinction, however, is immaterial for purposes of this decision.

Warrant Transaction partially offset the cost to Volcano of the Option Transaction and effectively raised the conversion price of the Convertible Notes from $32.83 to $37.59. As a result of the Call Spread Transactions, therefore, the Convertible Notes likely would not have had any dilutive effect until Volcano's common stock reached a price of $37.59 per share.

Goldman sold 65% of the Options under the Option Transaction and purchased 65% of the Warrants under the Warrant Transaction. J.P. Morgan sold and purchased the other 35%. The Options were set to expire on December 1, 2017, the same day that the Convertible Notes matured. The Warrants were set to expire over a 120-business day period beginning in March 2018. Alternatively, both the Options and the Warrants would terminate immediately upon the consummation of certain change in control transactions that required redemption of the Convertible Notes, including a cash-out merger. In the event of such a transaction, the Underwriters would pay Volcano the Options' fair value, and Volcano would pay the Underwriters the Warrants' fair value.

### 2. The Board explores merger options

In January 2014, as part of the Company's general business development outreach, Huennekens had meetings with two companies ("Company A" and "Company B") regarding their respective interests in a strategic transaction with Volcano. Afterwards, Volcano and the companies entered into confidentiality

agreements, and Volcano's senior management gave presentations to each of the companies.

In April 2014, as discussions with Company A and Company B progressed, Volcano retained Goldman to help perform a market check to gauge other companies' interest in a transaction. The Board and Goldman considered a total of thirteen potential buyers for Volcano, separated into six "tier 1 buyers"—including Philips—and seven "tier two buyers." The Board decided to narrow the scope of their market check by excluding (1) counterparties that would face significant regulatory approval issues and (2) financial buyers, based on Goldman's advice that Volcano's negative cash flow likely would not support a leveraged acquisition.

Ultimately, Volcano contacted five strategic buyers. In addition to Company A and Company B, the Board directed Goldman to contact two companies ("Company C" and "Company D") with whom Volcano's senior management had prior confidential discussions and authorized Huennekens to contact another company ("Company E"). In April 2014, Huennekens led a management presentation to Company E regarding a strategic transaction with Volcano. For various reasons, each of Companies A through E declined to pursue a strategic transaction with Volcano, and the Board ended its market check process.

### 3. Volcano and Philips enter into merger discussions, which end after Philips proposes an insufficient offer price

In June 2014, Philips, with which Volcano had a commercial relationship since 2007, expressed to Goldman that it was interested in exploring a strategic acquisition of the Company. Goldman relayed that information to Huennekens, who then consulted with Matricaria, the Chairman of the Board.

On June 23, 2014, Volcano and Philips entered into a confidentiality agreement, and merger discussions between the companies began in earnest. During the remainder of June and July 2014, Goldman and Lazard Ltd. ("Lazard")—Philips's financial advisor—held a number of meetings and telephone calls regarding a potential transaction and Volcano's financial performance. Members of Philips's and Volcano's management also communicated with one another and attended those financial advisor meetings during that time period.

On July 25, 2014, when Volcano's common stock closed at a price of $16.18 per share, Philips delivered a non-binding indication of interest to acquire Volcano for $24 per share, subject to an eight week period of exclusivity during which it would perform due diligence. On July 29, 2014, Goldman discussed with Volcano's senior management the potential effects that a change in control transaction would have on the Call Spread Transactions and proposed that Volcano consider the matter further. On July 30, 2014, the Board, members of Volcano's senior management, Goldman, and Volcano's legal counsel met to discuss

Philips's $24 per share indication of interest. At that meeting, the Board decided to allow Philips to proceed with due diligence, but without any commitment as to the $24 per share price or eight week exclusivity period. After Goldman's representatives left the meeting, the Board authorized the retention of Goldman as its financial advisor for the potential merger with Philips. As the Board's financial advisor, Goldman stood to earn a $17 million advisor fee, contingent on the consummation of Volcano's sale. The Board also authorized the creation of a transaction committee comprised of independent Board members to oversee the merger process and appointed Gallahue, Howe, Lukianov, and Matricaria to that committee (the "Transaction Committee"). Matricaria served as the Chairman of the Transaction Committee.

After the Board's July 30, 2014 meeting, Goldman conveyed to Lazard the Board's position that Philips could proceed with due diligence, but that the price would have to be increased above $24 per share for Volcano to consider exclusivity. On August 2, 2014, the Transaction Committee held a meeting with Volcano's senior management, Goldman, and the Board's legal advisor. Goldman informed the attendees that Philips had declined to increase its price above $24 per share and that it simply would proceed through due diligence without exclusivity. To accommodate Philips's due diligence requests, Volcano gave Philips access to a data room that contained the relevant documents. The Transaction Committee then

9

directed Goldman to reach out to Company A and Company D to gauge their respective interests in renewing talks regarding a potential transaction. Once again, the Transaction Committee declined to contact direct competitors with significant regulatory approval risks. Goldman followed up with both Company A and Company D, but neither was interested in renewing discussions regarding a potential acquisition of Volcano. At no point did either Volcano or Goldman receive any unsolicited expressions of interest from other potential suitors.

On August 7, 2014, while Philips was proceeding with due diligence, Volcano issued its earnings press release for the second quarter and shared with Philips that it was lowering its revenue guidance for the remainder of 2014 and reducing its projected long term growth rate. On August 8, 2014, Volcano's common stock closed at $12.56 per share. Philips continued its due diligence process, and the parties and their advisors began drafting a merger agreement. In connection with their ongoing discussions, Goldman told Lazard that the Board was meeting on September 12, 2014 and stated that if Volcano and Philips had not reached a firm agreement by that point, then the Board would halt negotiations and focus on running Volcano as a standalone company.

On September 12, 2014, Philips indicated to Huennekens that it had not completed its due diligence, but if Philips had to make a firm offer then it would be in the range of $17 to $18 per share. Huennekens relayed that message to the

Board, and Matricaria, on behalf of the Transaction Committee, instructed Goldman to inform Philips that the proposed price was insufficient. Volcano then closed the data room and directed its advisors to stop working on the transaction.

4. **Volcano and Philips rekindle their merger discussions, but cannot agree on a price**

On September 15, 2014, Huennekens met with Bert van Meurs, Senior Vice President of Philips Healthcare, at van Meurs's request. At their meeting, van Meurs indicated that Philips still was interested in a transaction with Volcano and wanted to complete due diligence. Huennekens reiterated that Philips's proposed price range was inadequate, but indicated that he and Matricaria would be willing to meet with members of Philips's senior management.

On September 29, 2014, Engaged Capital, an investment management firm and large stockholder of Volcano's, released a public letter to the Board calling for it to replace both Huennekens and Volcano's Chief Financial Officer and pressing for a sale of the Company. On October 1, 2014, Philips requested an October 10 meeting with Huennekens and Matricaria, to which they agreed. Before that meeting, Volcano agreed to reopen the data room to allow Philips to continue with its due diligence. Ten days later, on October 20, 2014, Philips presented another non-binding indication of interest to acquire Volcano for $17.25 per share and requested a response by October 22.

11

After receiving Philips's updated offer, the Transaction Committee met with its advisors. Goldman updated the Transaction Committee on its discussions with Lazard, and Matricaria described his discussions with Volcano's stockholders. The Transaction Committee reviewed the financial aspects of the revised indication of interest and discussed strategic alternatives. Ultimately, the Transaction Committee decided to recommend that the Board schedule another meeting to review strategic alternatives before responding to the offer. Subsequently, Goldman called Lazard and indicated that Volcano would not enter into any transaction at a price of less than $18 per share. On October 23, 2014, Philips withdrew its $17.25 per share indication of interest. Volcano once again closed access to the data room, and Goldman told Lazard that the Board had decided to cease merger discussions and instead focus on running Volcano as a standalone company.

### 5. Volcano and Philips enter into merger discussions for a third and final time

On October 28, 2014, Philips sent Volcano another non-binding indication of interest at $16 per share. The Transaction Committee met to discuss that offer, and Goldman, at Matricaria's direction, reiterated to Lazard that Volcano would not consider any offer below $18 per share. On November 6, 2014, Volcano announced better-than-expected financial results for the third quarter of 2014 and the Company's turnaround plan. On November 17, Philips's CEO, Frans van

Houten, called Matricaria to express Philips's continuing interest in acquiring Volcano at $16 per share. Matricaria responded that he expected Volcano's stock price to increase from its current price of $11.59 per share to $13 or $14 per share in the near future. As such, the Board would not consider a price less than $18 per share.

On November 21, 2014, van Houten again called Matricaria and expressed Philips's willingness to increase its offer to $18 per share, subject to the negotiation of a merger agreement and completion of its due diligence. Matricaria said that he would take the $18 per share price to the Board for approval if the parties could complete the merger agreement and announce the transaction by the week of December 1, 2014. Due diligence and negotiations over the merger agreement continued beyond December 1.

Philips also desired to retain Huennekens for a short period post-merger to assist with the transition. As such, on December 11, 2014, Philips sent a draft consulting agreement to be signed by Huennekens before the companies' boards signed the merger agreement. Huennekens, with the assistance of separate counsel, negotiated that consulting agreement (the "Consulting Agreement") with Philips from December 11 until December 15. Under the Consulting Agreement, Philips would pay Huennekens up to $500,000 for five months of consulting services for the surviving company in the merger between Philips and Volcano.

13

Further, upon consummation of such a merger, the Consulting Agreement provided that Huennekens would be terminated without cause from Volcano and, therefore, receive benefits totaling $7.8 million, including $3.1 million in cash.

On December 12, 2014, the Transaction Committee held a meeting to discuss the progress of the transaction. At that meeting, Goldman made a presentation regarding its financial interest in the Call Spread Transactions. Goldman then left the meeting, and the Transaction Committee consulted with its legal counsel and senior management about Goldman's interest in the Call Spread Transactions. Volcano's legal counsel and Goldman's legal counsel had discussed the Call Spread Transactions in both August and September 2014. Ultimately, the Transaction Committee decided that Goldman was not conflicted from serving as Volcano's financial advisor for the proposed transaction with Philips as a result of the Call Spread Transactions.

### 6. Volcano and Philips enter into a two-step merger under Section 251(h) of the Delaware General Corporation Law

On December 15, 2014, Philips informed Volcano that its board of directors had approved a cash-out merger with the Company at a price of $18 per share (the "Merger"). The Board met the next day along with its legal counsel, Goldman, and Volcano's senior management to consider the Merger. During that meeting, the Board's legal counsel reviewed the key provisions of the merger agreement (the "Merger Agreement"), including each of the agreed-to deal protection devices;

14

Huennekens reviewed the terms of the Consulting Agreement with the rest of the Board; and Goldman reviewed its financial analysis of the offer price and rendered an oral fairness opinion—which Goldman subsequently confirmed in a written opinion—in favor of Philips's $18 per share all-cash offer.

After Goldman left the meeting, the Board further discussed the Merger and unanimously approved the Merger and the Merger Agreement. The Merger Agreement provided that the Merger was to be consummated as a two-step transaction under Section 251(h) ("Section 251(h)") of the Delaware General Corporation Law (the "DGCL").[6] As such, the Board also resolved to recommend that Volcano's stockholders tender their shares into the first-step tender offer (the "Tender Offer") of that two-step transaction. Volcano and Philips then signed the Merger Agreement, and, on December 17, 2014, they issued a joint press release announcing the Merger.

Philips, through Merger Sub, commenced the Tender Offer to purchase all of Volcano's outstanding common stock for $18 per share in cash on December 30, 2014. That same day, Volcano filed the Recommendation Statement with the SEC recommending that Volcano's stockholders accept the Tender Offer. On February

---

[6]  8 *Del. C.* § 251(h) (allowing an acquiring company to consummate a merger without a target company stockholder vote after acquiring a majority of the target's shares pursuant to a tender or exchange offer for all of the target company's outstanding shares, subject to certain conditions).

17, 2015, the Tender Offer closed, with 89.1% of Volcano's outstanding shares having tendered. In addition, notices of guaranteed delivery were provided with respect to 5.7% of Volcano's outstanding shares. On February 17, 2015, following the Tender Offer's expiration, Volcano and Philips consummated the Merger without a stockholder vote under Section 251(h). Merger Sub merged into Volcano, and Volcano survived as a wholly-owned subsidiary of Philips's. As required by Section 251(h), non-tendering Volcano stockholders who were cashed out in the second-step merger received the same consideration—$18 per share in cash—as the stockholders that had accepted the Tender Offer. The Merger was valued at $1.2 billion, and Philips financed it with a combination of cash-on-hand and a debt issuance.

As a result of the Merger, the Convertible Notes and, correspondingly, the Call Spread Transactions were terminated. Because neither the Options nor the Warrants had expired as of the date of the Merger, the Underwriters had to pay Volcano the Options' fair value, and Volcano had to pay the Underwriters the Warrants' fair value. The net result of the termination of the Call Spread Transactions, as between Volcano and Goldman, was a $24.6 million payment from Volcano to Goldman. Further, the Board and Volcano's senior management, collectively, received approximately $8.9 million in Volcano stock options and restricted stock units that were accelerated as a result of the Merger. Finally,

Huennekens received the $7.8 million in severance benefits that he had negotiated as part of the Consulting Agreement.

## C. Procedural History

On December 22, 2014 and January 9, 2015, before the Merger closed, each of the three Plaintiffs filed their individual class action complaints seeking to enjoin the Merger. On January 12, 2015, Plaintiffs each filed separate motions for expedited proceedings. On January 16, the Court consolidated the three actions into this single action. A hearing on Plaintiffs' motion for a preliminary injunction was scheduled for January 27, but, after Volcano made supplemental disclosures on January 22,[7] Plaintiffs withdrew that motion and the hearing was cancelled.

On March 2, 2015, after the Merger closed, Plaintiffs filed the amended Complaint. Defendants filed motions to dismiss the Complaint under Rule 12(b)(6) on May 8, 2015 (the "Motions"). By August 2015, the parties had completed their initial round of briefing on the Motions. In December 2015, however, the parties stipulated to a supplemental round of briefing on the Motions to account for relevant Delaware Supreme Court decisions that had been published in the interim. The parties completed that supplemental round of briefing in

---

[7] *See* Li Aff., Ex. K ("Recommendation Statement Supplement").

February 2016, and I held an oral argument on the Motions on March 15, 2016. This Opinion contains my rulings on Defendants' Motions.

### D. Parties' Contentions

Plaintiffs' Complaint alleges three causes of action against Defendants. Count I claims that the Board breached its duties of care and loyalty in connection with the Merger. Count II—which Plaintiffs withdrew when they dismissed Philips and Merger Sub from this action[8]—claims that Philips and Merger Sub aided and abetted the Board's alleged fiduciary duty breaches. Count III claims that Goldman aided and abetted the Board's alleged fiduciary duty breaches.

As to Counts I and III, Plaintiffs contend that the Board (1) acted in an uninformed manner in approving the Merger and (2) was motivated by certain benefits—including Huennekens's Consulting Agreement and the other Board members' accelerated vesting of stock options and restricted stock units—that its members stood to receive as a result of the Merger. Further, Plaintiffs posit that the Board relied on "flawed advice" rendered by its "highly conflicted financial advisor," Goldman.[9] Goldman's alleged conflicts resulted from the fact that it, along with J.P. Morgan, served as Volcano's counterparty in the Call Spread Transactions and profited at Volcano's expense when the Options and Warrants

---

[8]     *See supra* note 4.

[9]     Pl.'s Answering Br. 1.

18

were terminated upon consummation of the Merger. Plaintiffs also allege that Goldman hid its conflicts from the Board and Volcano's stockholders.

Defendants deny that the Board was uninformed as to the Merger and maintain that any benefits the Board stood to receive from the Merger were routine and aligned the Board's interests with Volcano's stockholders' interests. Defendants also dispute whether Goldman's position in the Call Spread Transactions rendered Goldman conflicted and contend that, to the extent any such conflicts existed, the Board and Volcano's stockholders were fully informed regarding the impact of the Merger on the Options and Warrants. Finally, Defendants argue that the Complaint should be dismissed because Volcano's stockholders approved the Merger by overwhelmingly tendering into the Tender Offer.

## II. ANALYSIS

### A. Legal Standard for a Motion to Dismiss Under Rule 12(b)(6)

This Court may grant a motion to dismiss under Rule 12(b)(6) for failure to state a claim if a complaint does not allege facts that, if proven, would entitle the plaintiff to relief. "[T]he governing pleading standard in Delaware to survive a motion to dismiss is reasonable 'conceivability.'"[10] When considering such a

---

[10] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Hldgs. LLC*, 27 A.3d 531, 537 (Del. 2011) (footnote omitted).

motion, the Court must "accept all well-pleaded factual allegations in the Complaint as true . . . , draw all reasonable inferences in favor of the plaintiff, and deny the motion unless the plaintiff could not recover under any reasonably conceivable set of circumstances susceptible of proof."[11] This reasonable "conceivability" standard asks whether there is a "possibility" of recovery.[12] The Court, however, need not "accept conclusory allegations unsupported by specific facts or . . . draw unreasonable inferences in favor of the non-moving party."[13] Failure to plead an element of a claim precludes entitlement to relief, and, therefore, is grounds to dismiss that claim.[14]

### B. The Business Judgment Rule Irrebuttably Applies to the Merger

As an initial matter, I must determine what standard of review to apply in evaluating Defendants' alleged fiduciary duty breaches. Because Volcano's stockholders received cash for their shares, the *Revlon* standard of review presumptively applies.[15] Defendants contend, however, that because Volcano's fully informed, uncoerced, disinterested stockholders approved the Merger by

---

[11] *Id.* at 536 (citing *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896-97 (Del. 2002)).

[12] *Id.* at 537 & n.13.

[13] *Price v. E.I. duPont de Nemours & Co., Inc.*, 26 A.3d 162, 166 (Del. 2011) (citing *Clinton v. Enter. Rent-A-Car Co.*, 977 A.2d 892, 895 (Del. 2009)).

[14] *Crescent/Mach I P'rs, L.P. v. Turner*, 846 A.2d 963, 972 (Del. Ch. 2000).

[15] *See TW Servs., Inc. v. SWT Acq. Corp.*, 1989 WL 20290, at *7 (Del. Ch. 1989).

20

tendering a majority of the Company's outstanding shares into the Tender Offer, the business judgment rule standard of review irrebuttably applies.[16] According to Defendants, the stockholders' approval of the Merger had that cleansing effect despite the fact that (1) the Merger otherwise would have been subject to the *Revlon* standard of review and (2) the Tender Offer was statutorily required to consummate the Merger. Defendants, therefore, assert that Plaintiffs can challenge the Merger solely on the basis that it constituted waste.

Plaintiffs disagree. Plaintiffs counter that because a tender offer does not have the same cleansing effect as a stockholder vote, the Court should not shift its standard of review from *Revlon* to the business judgment rule. Alternatively, Plaintiffs maintain that even if a tender offer has the same cleansing effect as a

---

[16] In this context, if the business judgment rule is "irrebuttable," then a plaintiff only can challenge a transaction on the basis of waste—*i.e.*, that it "cannot be 'attributed to any rational business purpose.'" *See Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1993) ("The business judgment rule posits a powerful presumption in favor of actions taken by the directors in that a decision made by a loyal and informed board will not be overturned by the courts unless it cannot be 'attributed to any rational business purpose.'" (quoting *Sinclair Oil Corp. v. Levien*, 280 A.2d 717, 720 (Del. 1971))). If, by contrast, the business judgment rule is "rebuttable," then a board's violation of either the duty of care or duty of loyalty—even based on facts that were disclosed to stockholders before they approved a transaction—would render the business judgment rule inapplicable. *See id.* ("To rebut the [business judgment] rule, a shareholder plaintiff assumes the burden of providing evidence that directors, in reaching their challenged decision, breached [the duties of] loyalty or due care. If a shareholder plaintiff fails to meet this evidentiary burden, the business judgment rule attaches to protect corporate officers and directors and the decisions they make, and our courts will not second-guess these business judgments." (citations omitted)).

stockholder vote and the business judgment rule presumption applies, that presumption is rebuttable. Finally, Plaintiffs argue that regardless of the theoretical cleansing effect of Volcano's stockholders' approval of the Merger by tendering their shares, no such cleansing effect should be accorded here because those stockholders were not, in fact, fully informed.

I resolve the parties' disputes in the following manner. First, recent Supreme Court decisions confirm that the approval of a merger by a majority of a corporation's outstanding shares pursuant to a statutorily required vote of the corporation's fully informed, uncoerced, disinterested stockholders renders the business judgment rule irrebuttable. Second, I conclude that stockholder approval of a merger under Section 251(h) by accepting a tender offer has the same cleansing effect as a vote in favor of that merger. Third, I find that the business judgment rule irrebuttably applies to the Merger because Volcano's disinterested, uncoerced, fully informed stockholders tendered a majority of the Company's outstanding shares into the Tender Offer.

> 1. **The fully informed, uncoerced, disinterested approval of a merger by a majority of a corporation's outstanding shares pursuant to a statutorily required vote renders the business judgment rule irrebuttable**

The parties' disagreement regarding the applicable standard of review stems from a recent line of decisions issued by this Court and the Supreme Court, including (1) this Court's October 14, 2014 *In re KKR Financial Holdings LLC*

*Shareholder Litigation* ("*KKR*") decision,[17] (2) this Court's October 1, 2015 *In re Zale Corp. Stockholders Litigation* ("*Zale I*") decision,[18] (3) the Supreme Court's October 2, 2015 *Corwin v. KKR Financial Holdings LLC* ("*Corwin*") decision,[19] (4) this Court's October 20, 2015 *In re TIBCO Software, Inc. Stockholders Litigation* decision,[20] and (5) this Court's October 29, 2015 *In re Zale Corp. Stockholders Litigation* ("*Zale II*") decision.[21]

In *KKR*, Chancellor Bouchard cited a number of cases that support the proposition that after "a fully-informed stockholder vote of a transaction with a non-controlling stockholder . . . the business judgment rule applies and insulates the transaction from all attacks other than on the grounds of waste, even if a majority of the board approving the transaction was not disinterested or independent."[22]   The Chancellor then noted that "[i]n light of the Delaware Supreme Court's 2009 decision in *Gantler v. Stephens*, there has been some debate

---

[17]   101 A.3d 980 (Del. Ch. 2014).

[18]   2015 WL 5853693 (Del. Ch. Oct. 1, 2015) ("*Zale I*").

[19]   125 A.3d 304 (Del. 2015).

[20]   2015 WL 6155894 (Del. Ch. Oct. 20, 2015).

[21]   2015 WL 6551418 (Del. Ch. Oct. 29, 2015) ("*Zale II*").

[22]   101 A.3d at 1001 (citing *Harbor Fin. P'rs v. Huizenga*, 751 A.2d 879, 890 (Del. Ch. 1999); *In re Wheelabrator Techs., Inc. S'holders Litig.*, 663 A.2d 1194, 1200 (Del. Ch. 1995)).

as to whether [that rule applies] when the stockholder vote is statutorily required as opposed to a purely voluntary stockholder vote."[23] Chancellor Bouchard disagreed with that interpretation of *Gantler*, however, and found that it simply clarified that the term "ratification" applies only to non-statutorily required stockholder votes rather than "alter[ing] the legal effect of a stockholder vote when it is statutorily required."[24] He then granted the defendants' motion to dismiss.

In *Zale I*, Vice Chancellor Parsons declined to follow Chancellor Bouchard's holding in *KKR*. Despite the presence of a fully informed, uncoerced vote in favor of the merger at issue by a majority of the target corporation's disinterested stockholders, Vice Chancellor Parsons applied the *Revlon* standard of review and stated that "[u]ntil the Supreme Court signals otherwise, I interpret *Gantler* as holding that an enhanced standard of review cannot be pared down to the business judgment rule as a result of" a statutorily required vote.[25] Vice Chancellor Parsons cited *In re Santa Fe Pacific Corp. Shareholder Litigation* for the proposition that "[p]ermitting the vote of a majority of stockholders on a merger to remove from judicial scrutiny unilateral Board action in a contest for corporate control would

---

[23]  *Id.*

[24]  *Id.*

[25]  2015 WL 5853693, at *10 (citing *In re Santa Fe Pacific Corp. S'holder Litig.*, 669 A.2d 59, 68 (Del. 1995)).

24

frustrate the purposes underlying *Revlon*," but also indicated that he "would follow the reasoning articulated in *KKR* if it permitted a review of the Merger under" the rebuttable, as opposed to an irrebuttable, business judgment rule presumption.[26]

On October 2, 2015, the day after *Zale I* was published, the Supreme Court issued *Corwin*.[27] In *Corwin*, the Supreme Court affirmed *KKR* and held, in relevant part, that "when a transaction not subject to the entire fairness standard is approved by a fully informed, uncoerced vote of the disinterested stockholders, the business judgment rule applies," even in a statutorily required vote on a transaction otherwise subject to the *Revlon* standard of review.[28]

After the Supreme Court issued *Corwin*, the *Zale I* defendants moved for reargument. In *Zale II*, Vice Chancellor Parsons granted the defendants' motion for reargument, finding that, under *Corwin*, he should have applied the business judgment rule standard of review rather than the *Revlon* standard of review.[29] Vice Chancellor Parsons interpreted *Corwin*, however, as diverging from *KKR* in that it allowed for application of the rebuttable business judgment rule presumption, on the following bases:

---

[26]  *Id.*

[27]  125 A.3d 304.

[28]  *Id.* at 308-09.

[29]  2015 WL 6551418, at *2.

25

> [A]lthough the Supreme Court generally affirmed *KKR,* the Court also suggested that "the gross negligence standard for director due care liability under *Van Gorkom*" is the proper standard for evaluating "post-closing money damages claims." While the Court in *Corwin* quotes *KKR* and a law review article for the proposition that a fully informed majority vote of disinterested stockholders insulates directors from all claims except waste in the explanatory parentheticals of two footnotes, the Court itself does not hold that anywhere in its opinion. And, in *In re TIBCO Software, Inc. Stockholders Litigation*, which was issued after *Corwin,* Chancellor Bouchard, the author of *KKR*, denied a motion to dismiss after finding it reasonably conceivable that the directors had breached their duty of care by acting in a grossly negligent manner, despite the absence of any indication that the merger was not approved by a majority of disinterested stockholders in a fully informed vote.[30]

Thus, although he eventually concluded in *Zale II* that the plaintiffs' duty of care claims should be dismissed, Vice Chancellor Parsons examined the substance of those claims to determine whether they sufficiently pled that the defendant-board was grossly negligent during the merger process, as opposed to evaluating simply whether the plaintiffs' had stated a waste claim.[31]

---

[30] *Id.* at *3 (citing *In re TIBCO Software Inc. S'holders Litig.*, 2015 WL 6155894 (Del. Ch. Oct. 20, 2015); *Corwin*, 125 A.3d at 308-09 nn.13 & 19) (quoting *Corwin*, 125 A.3d at 312).

[31] *Id.* at *4-5.

26

On May 6, 2016, after the parties here already had completed their briefing, the Supreme Court issued *Singh v. Attenborough*.[32] In *Attenborough*, the Supreme Court affirmed *Zale I*, as modified by *Zale II*, but clarified the standard of review that the Court of Chancery should have applied to the plaintiffs' duty of care claims in *Zale II*:

> [T]he reargument opinion's decision to consider post-closing whether the plaintiffs stated a claim for the breach of the duty of care after invoking the business judgment rule was erroneous. Absent a stockholder vote and absent an exculpatory charter provision, the damages liability standard for an independent director or other disinterested fiduciary for breach of the duty of care is gross negligence, even if the transaction was a change-of-control transaction. Therefore, employing this same standard after an informed, uncoerced vote of the disinterested stockholders would give no standard-of-review-shifting effect to the vote. When the business judgment rule standard of review is invoked because of a vote, dismissal is typically the result. That is because the vestigial waste exception has long had little real-world relevance, because it has been understood that stockholders would be unlikely to approve a transaction that is wasteful.[33]

In *Attenborough*, therefore, the Supreme Court held that upon a fully informed vote by a majority of a company's disinterested, uncoerced stockholders, the business judgment rule irrebuttably applies to a court's review of the approved

---

[32]   2016 WL 2765312 (Del. May 6, 2016) (ORDER).

[33]   *Id.* at *1.

27

transaction, even when that vote is statutorily required and the transaction otherwise would be subject to the *Revlon* standard of review. Thus, such an approved transaction only can be challenged on the basis that it constituted waste. I now examine whether that same reasoning applies to a merger approved through stockholder acceptance of a tender offer.

> **2. Stockholder acceptance of a tender offer pursuant to a Section 251(h) merger has the same cleansing effect as a stockholder vote in favor of a transaction**

The Delaware General Assembly adopted Section 251(h) in 2013 and amended it in 2014 and 2016.[34] Section 251(h) "permit[s] a merger agreement to include a provision eliminating the requirement of a stockholder vote to approve certain mergers"[35] if, among other requirements, the acquiror consummates a tender or exchange offer that results in the acquiror owning "at least such percentage of the shares of stock of [the target] corporation . . . that, absent

---

[34] *See* 79 Del. Laws ch. 72, § 6 (2013), *as amended by* 79 Del. Laws ch. 327, § 7 (2014), 80 Del. Laws ch. 265, § 7 (2016). Because the parties entered into the Merger Agreement in December of 2014, the General Assembly had not yet adopted the 2016 amendments to Section 251(h). Those 2016 amendments, therefore, are inapplicable to the Merger. *See* 80 Del. Laws ch. 265, § 17 (2016) ("Section 7 shall be effective only with respect to merger agreements entered into on or after August 1, 2016."). For the sake contemporaneousness, however, I quote the most updated version of Section 251(h) in this Opinion. The differences between the 2014 version and the 2016 version of Section 251(h) are immaterial to this Opinion.

[35] Del. H.B. 127 syn., 147th Gen. Assem. (2013).

[Section 251(h)], would be required to adopt the agreement of merger by [the DGCL] and by the certificate of incorporation of [the target] corporation."[36] Similar two-step mergers were consummated with some regularity before Section 251(h)'s enactment, largely through "top-up options,"[37] which gave acquirors— after completing a first-step tender offer—the ability to purchase up to 90% of the target corporation's stock and consummate a second-step, short-form merger without a stockholder vote.[38] Through Section 251(h), therefore, "the Delaware General Assembly essentially . . . approved [the two-step merger] transactional structure . . . [and] facilitate[d] the ability of the acquirer in a two-step acquisition . . . to use a short-form back-end merger without resorting to a top-up option."[39]

Two concerns have been raised to support the argument that stockholder acceptance of a tender offer and a stockholder vote differ in a manner that should preclude the cleansing effect articulated by the Supreme Court in *Corwin* from applying to tender offers. Section 251(h) addresses each of those concerns. The

---

[36]     8 *Del. C.* § 251(h)(3).

[37]     *See, e.g.*, *In re Cogent, Inc. S'holder Litig.*, 7 A.3d 487, 504-08 & n.56 (Del. Ch. 2010) (describing top-up options and noting that the vast majority of two-step mergers included those options).

[38]     8 *Del. C.* § 253 (permitting a parent company that owns 90% of a subsidiary corporation's outstanding stock to merge with that subsidiary without the approval of the subsidiary's minority stockholders).

[39]     *In re Comverge, Inc.*, 2014 WL 6686570, at *14 (Del. Ch. Nov. 25, 2014).

29

first concern suggests that tender offers may differ from statutorily required stockholder votes based on "the lack of any explicit role in the [DGCL] for a target board of directors responding to a tender offer."[40] A target board's role in negotiating a two-step merger subject to a first-step tender offer under Section 251(h), however, is substantially similar to its role in a merger subject to a stockholder vote under Section 251(c) of the DGCL.[41] Section 251(h) requires that the merging corporations enter into a merger agreement that expressly "[p]ermits or requires such merger be effected under [Section 251(h)]."[42] Because Section 251(h) requires a merger agreement, Sections 251(a) and (b) of the DGCL subject that agreement to the same obligations as a merger or consolidation consummated under any other section of the DGCL.[43] For example, the target corporation's board must "adopt a resolution approving" that agreement "and declaring its advisability," and the merger agreement must provide "[t]he terms and conditions of the merger."[44] The first-step tender offer also must be made "on the terms

---

[40] *See, e.g.*, *Espinoza v. Zuckerberg*, 124 A.3d 47 (Del. Ch. 2015) (quoting *In re CNX Gas Corp. S'holders Litig.*, 4 A.3d 397, 407 (Del. Ch. 2010)).

[41] *Compare* 8 *Del. C.* § 251(h), *with id.* § 251(c).

[42] *Id.* § 251(h)(1)(a).

[43] *Id.* § 251(a)-(b).

[44] *Id.* § 251(b), (b)(1).

provided" in the negotiated merger agreement.[45]  And, in recommending that its stockholders tender their shares in connection with a Section 251(h) merger, the target corporation's board has the same disclosure obligations as it would in any other communication with those stockholders.[46]  Taken together, therefore, Sections 251(a), (b), and (h) of the DGCL mandate that a target corporation's board negotiate, agree to, and declare the advisability of the terms of both the first-step tender offer and the second-step merger in a Section 251(h) merger, just as a target corporation's board must negotiate, agree to, and declare the advisability of a merger involving a stockholder vote under Section 251(c).  The target board also

---

[45]    *Id.* § 251(h)(2).

[46]    *See Matador Capital Mgmt. Corp. v. BRC Hldgs., Inc.*, 729 A.2d 280, 294-95 (Del. Ch. 1998) (citing *Zirn v. VLI Corp.*, 621 A.2d 773, 778 (Del. 1993)) ("At argument, counsel for [one of the defendants] suggested that I should construe the [target corporation's] directors' state law based fiduciary duty of disclosure more narrowly in the case of a Schedule 14D–9 [recommending that stockholders accept a first-step tender offer] than would be true in the case of a proxy statement [recommending that stockholders vote in favor of a one-step merger], because Schedules 14D–9 are reactive documents requiring, by federal law, only a limited amount of disclosure.  The point is well taken, of course, that it is federal law, not state law, that prescribes the items of disclosure required by Schedule 14D–9 and that mandates the dissemination of that disclosure statement to the stockholders of the subject company. The actual recommendation itself, however, is the product of state law, in this case the requirement under Section 251 of the DGCL that the [target corporation's] directors approve and recommend the proposed Agreement. State law, not federal law, establishes the norms within which such approval and recommendation is given.  Thus, it is hardly surprising that state fiduciary duty law has a role to play in regulating what directors actually say when recommending approval of a proposal or transaction to their stockholders, whether that recommendation is communicated in a Schedule 14D–9 or some other document.").

31

is subject to the same common law fiduciary duties, regardless of the subsection under which the merger is consummated.

The second concern suggests that a first-step tender offer in a two-step merger arguably is more coercive than a stockholder vote in a one-step merger.[47] Section 251(h), however, alleviates the coercion that stockholders might otherwise be subject to in a tender offer because (1) the first-step tender offer must be for all of the target company's outstanding stock,[48] (2) the second-step merger must "be effected as soon as practicable following the consummation of the" first-step tender offer,[49] (3) the consideration paid in the second-step merger must be of "the same amount and kind" as that paid in the first-step tender offer,[50] and (4) appraisal rights are available in all Section 251(h) mergers,[51] subject to the conditions and

---

[47] *See, e.g.*, *In re Pure Res., Inc., S'holders Litig.*, 808 A.2d 421, 441-42 (Del. Ch. 2002) ("Indeed, many commentators would argue that the tender offer form is more coercive than a merger vote. In a merger vote, stockholders can vote no and still receive the transactional consideration if the merger prevails. In a tender offer, however, a non-tendering shareholder individually faces an uncertain fate." (footnote omitted)).

[48] 8 *Del. C.* § 251(h)(2).

[49] *Id.* § 251(h)(1)(b).

[50] *Id.* § 251(h)(5).

[51] *Id.* § 262(b)(3) ("In the event all of the stock of a subsidiary Delaware corporation party to a merger effected under § 251(h) . . . is not owned by the parent immediately prior to the merger, appraisal rights shall be available for the shares of the subsidiary Delaware corporation.").

32

requirements of Section 262 of the DGCL. Thus, Section 251(h) appears to eliminate the policy bases on which a first-step tender offer in a two-step merger may be distinguished from a statutorily required stockholder vote, at least as it relates to the cleansing effect rendered therefrom.[52]

Further, the policy considerations underlying the holding in *Corwin* do not provide any basis for distinguishing between a stockholder vote and a tender offer. In *Corwin*, the Supreme Court justified its decision to afford a transaction approved pursuant to a statutorily required stockholder vote the benefit of the irrebuttable business judgment rule presumption as follows:

> [W]hen a transaction is not subject to the entire fairness standard, the long-standing policy of our law has been to avoid the uncertainties and costs of judicial second-guessing when the disinterested stockholders have had the free and informed chance to decide on the economic merits of a transaction for themselves. . . . The reason for that is tied to the core rationale of the business judgment rule, which is that judges are poorly positioned to evaluate the wisdom of business decisions and there is little utility to having them second-guess the determination of impartial decision-makers with more information (in the case of directors) or an actual economic stake in the outcome (in the case of informed,

---

[52] The parallels between Sections 251(c) and 251(h) of the DGCL are evidenced further by Section 251(h)(3), which requires that the first-step tender offer result in the acquiror holding as many shares of the target corporation's outstanding stock as would otherwise be required to vote in favor of a merger under Section 251(c). *See id.* § 251(h)(3). In other words, the same number of the target corporation's outstanding shares must approve a merger, regardless of whether it is consummated under Section 251(c) or Section 251(h).

33

> disinterested stockholders). In circumstances, therefore, where the stockholders have had the voluntary choice to accept or reject a transaction, the business judgment rule standard of review is the presumptively correct one and best facilitates wealth creation through the corporate form.[53]

Those justifications are equally applicable to a tender offer in a Section 251(h) merger. When a merger is consummated under Section 251(h), the first-step tender offer essentially replicates a statutorily required stockholder vote in favor of a merger in that both require approval—albeit pursuant to different corporate mechanisms—by stockholders representing at least a majority of a corporation's outstanding shares to effectuate the merger. A stockholder is no less exercising her "free and informed chance to decide on the economic merits of a transaction" simply by virtue of accepting a tender offer rather than casting a vote. And, judges are just as "poorly positioned to evaluate the wisdom of" stockholder-approved mergers under Section 251(h) as they are in the context of corporate transactions with statutorily required stockholder votes.

Additionally, although much of *Corwin* refers to a stockholder vote in favor of a transaction, the Supreme Court, at times, uses the terms "approve" and "vote" interchangeably.[54] The Supreme Court also included *In re Morton's Restaurant*

---

[53]     *Corwin*, 125 A.3d at 312-13.

[54]     *See, e.g.*, *id* at 306, 310 ("[W]e find that the Chancellor was correct in finding that the voluntary judgment of the disinterested stockholders to approve the merger

*Group, Inc. Shareholders Litigation*—a case involving a two-step merger with a first-step tender offer—among the cases it cited "for the proposition that the approval of the disinterested stockholders in a fully informed, uncoerced vote that was required to consummate a transaction has the effect of invoking the business judgment rule."[55]  In addition, numerous other Delaware decisions have equated stockholder acceptance of a tender offer with a stockholder vote in favor of a merger,[56] especially where "the first-step tender offer in a two-step transaction is

---

invoked the business judgment rule standard of review and that the plaintiffs' complaint should be dismissed. . . . [T]he plaintiffs did not contest the defendants' argument below that if the merger was not subject to the entire fairness standard, the business judgment standard of review was invoked because the merger was approved by a disinterested stockholder majority.  The Chancellor agreed with that argument below, and adhered to precedent supporting the proposition that when a transaction not subject to the entire fairness standard is approved by a fully informed, uncoerced vote of the disinterested stockholders, the business judgment rule applies.").

[55]  *See id.* at 310 n.19 (citing *Morton's*, 74 A.3d at 663 n.34).

[56]  *See, e.g.*, *Bershad v. Curtiss-Wright Corp.*, 535 A.2d 840, 842 (Del. 1987) ("An informed minority stockholder . . . who either votes in favor of a merger or accepts the benefits of the transaction [by accepting a tender offer] cannot thereafter attack the fairness of the merger price."); *Morton's*, 74 A.3d at 663 n.34 (characterizing a tender offer as "approv[al] by 92% of the stockholders in a non-coerced, fully informed manner" and noting that "when disinterested approval of a sale to an arm's-length buyer is given by a majority of stockholders who have had the chance to consider whether or not to approve a transaction for themselves, there is a long and sensible tradition of giving deference to the stockholders' voluntary decision, invoking the business judgment rule standard of review, and limiting any challenges to the difficult argument that the transaction constituted waste"); *In re Orchid Cellmark Inc. S'holder Litig.*, 2011 WL 1938253, at *13 (Del. Ch. May 12, 2011) ("Tendering, of course, is a substitute for shareholder vote, and courts should be careful about depriving shareholders of their opportunity to make such a

35

conditioned on tenders of a majority of the outstanding shares."[57] As such, I am convinced that the Supreme Court did not intend that its holding in *Corwin* be limited to stockholder votes only.

Finally, Plaintiffs cite to Chancellor Bouchard's *Espinoza v. Zuckerberg* decision for the proposition that tender offers should not be given the same cleansing effect under *Corwin* as a statutorily required vote.[58] The plaintiff-stockholder's derivative action in *Zuckerberg* challenged a board's approval of a compensation plan for a majority of the board's directors.[59] The parties agreed that the board's approval of that compensation was a self-dealing transaction that

---

choice, especially with such a significant premium to prior market price."); *Matador Capital*, 729 A.2d at 294 (noting that, in a two-step transaction where the first-step was a cash tender offer for a majority of the corporation's outstanding common stock, the corporation's " stockholders are being asked to decide to approve the sale of their corporation as a part of their decision whether or not to tender shares in the first-step tender offer"); *see also* J. Travis Laster, *The Effect of Stockholder Approval on Enhanced Scrutiny*, 40 Wм. Mitchell L. Rev. 1443, 1459 n.57 (2014) ("This article discusses the concept of stockholder approval in terms of a stockholder vote, which is the typical context in which the issue arises. Stockholders also can consent to a transaction by tendering their shares. If the first-step tender offer in a two-step transaction is conditioned on tenders of a majority of the outstanding shares, and if sufficient stockholders tender to satisfy the condition, then it should have the same effect as an affirmative stockholder vote." (citation omitted)).

[57]    *See* Laster, *supra* note 56, at 1459 n.57.

[58]    Pls.' Supplemental Answering Br. 2-4 (citing *Zuckerberg*, 124 A.3d 47).

[59]    124 A.3d at 51-52.

would be subject to the entire fairness standard of review in the first instance.[60] After the plaintiff-stockholder filed his lawsuit, however, the company's 61% controlling stockholder expressed his approval of that compensation in a deposition and an affidavit.[61] According to the defendants, the controlling stockholder's post hoc approval constituted ratification, subjecting the board's decision to approve the director compensation to the business judgment rule standard of review rather than entire fairness.[62]

Chancellor Bouchard rejected the defendants' argument that the controlling stockholder's informal approval of the compensation constituted ratification and held "that stockholder ratification of an interested transaction, so as to shift the standard of review from entire fairness to the business judgment presumption, cannot be achieved without complying with the statutory formalities in the DGCL for taking stockholder action."[63] *Zuckerberg*, therefore, focuses on corporate formalities and emphasizes that stockholders must follow the DGCL's prescribed

---

[60]     *Id.* at 49.

[61]     *Id.* at 52-53.

[62]     *Id.* at 54-55.

[63]     *Id.* at 66.

methods for taking stockholder action to obtain the benefits of ratification.[64]

Specifically, stockholders must either "vot[e] at a stockholder meeting or act[] by written consent in compliance with Section 228 of the [DGCL]."[65]  The controlling stockholder's informal approval did not constitute ratification in *Zuckerberg* precisely because it diverged from the DGCL's required corporate formalities.  In this case, there is no dispute that the Board complied with the DGCL's prescribed procedures for consummating a merger under Section 251(h).  Thus, *Zuckerberg* largely is inapposite.

Nonetheless, Plaintiffs contend that Chancellor Bouchard recognized a substantive distinction between tender offers and stockholder votes that precludes this Court from affording a *Corwin*-based cleansing effect to mergers

---

[64]    *See id.* at 57-58 ("In sum, the provisions of the DGCL governing the ability of stockholders to take action, whether by voting at a meeting or by written consent, demonstrate the importance of ensuring precision, both in defining the exact nature of the corporate action to be authorized, and in verifying that the requirements for taking such an action are met, including that the transaction received enough votes to be effective.  They also demonstrate the importance of providing transparency to stockholders, whose rights are affected by the actions of the majority.  In particular, stockholders have the right to participate in a meeting at which a vote is to be taken after receiving notice and all material information or, in the case of action taken by written consent, to receive prompt notice after the fact of the action taken." (footnote omitted)).

[65]    *Id.* at 50.

accomplished through first-step tender offers.[66]  To support that contention,

Plaintiffs rely on the following excerpt from *Zuckerberg*:

> [D]efendants suggest that stockholder acts such as tendering shares serve as an example of less formal ratification. This suggestion is unpersuasive, because expressing approval of the sale of a company by tendering shares is not analogous to stockholder ratification. "Approving" a two-step transaction by tendering a sufficient number of shares in a tender offer is a functional requirement for completing such a transaction. Directors cannot tender stockholders' shares for them, so stockholders are not ratifying the transaction, but effectuating it in the first instance. . . . Thus tendering shares bears no meaningful resemblance to a post hoc ratification of directors' actions.[67]

I disagree with Plaintiffs' interpretations of both (1) Defendants' argument

regarding the Tender Offer's cleansing effect and (2) Chancellor Bouchard's

decision in *Zuckerberg*.  First, Chancellor Bouchard distinguishes a post hoc

stockholder vote or written consent from a first-step tender offer in the context of

deciding what form stockholder assent must take to constitute ratification.  But,

Defendants do not argue that the Tender Offer constituted stockholder ratification.

Instead, Defendants argue that the Tender Offer affords the Merger the same

---

[66]    Pls.' Supplemental Answering Br. 2-4.

[67]    *Id.* at 61 (footnotes omitted) (citing *Orchid Cellmark Inc.*, 2011 WL 1938253, at *13; *Matador Capital*, 729 A.2d at 294).

39

cleansing effect that *Corwin* affords to a statutorily required vote in favor of a merger.

Second, in *Gantler*, the Supreme Court differentiated between a statutorily required vote and stockholder "ratification."[68] It is consistent with *Gantler*, therefore, that just as a statutorily required vote does not constitute "ratification," stockholder acceptance of a tender offer also does not constitute "ratification."[69] Despite that distinction, the Supreme Court in *Corwin* held that a statutorily required vote by a stockholder majority—which, just as a first-step tender offer in a two-step merger, "effectuat[es a transaction] in the first instance"[70]—irrebuttably invokes the business judgment rule.[71] As such, the fact that a first-step tender offer in a two-step merger does not constitute "ratification" is not dispositive as to the cleansing effect of stockholder approval as expressed through acceptance of such a

---

[68]     *KKR*, 101 A.3d at 1002-03 ("I read the Supreme Court's discussion of the doctrine of ratification in *Gantler* to have been intended simply to clarify that the term 'ratification' applies only to a voluntary stockholder vote. As the Supreme Court stated in a footnote at the end of its decision, '[t]his Opinion clarifies that "ratification" legally describes only corporate action where stockholder approval is not statutorily required for its effectuation.'" (footnote omitted) (quoting *Gantler*, 965 A.2d at 714 n.55)).

[69]     *Zuckerberg*, 124 A.3d at 61.

[70]     *Id.*

[71]     *Corwin*, 125 A.3d at 308-09.

40

tender offer. Interpreting *Zuckerberg* differently would contradict *Corwin*'s holding.[72]

I conclude that the acceptance of a first-step tender offer by fully informed, disinterested, uncoerced stockholders representing a majority of a corporation's outstanding shares in a two-step merger under Section 251(h) has the same cleansing effect under *Corwin* as a vote in favor of a merger by a fully informed, disinterested, uncoerced stockholder majority. As a result, I now examine whether the Volcano stockholders that accepted the Tender Offer were fully informed, disinterested, and uncoerced.

### 3. Volcano's stockholders were fully informed, disinterested, and uncoerced

Because stockholders representing a majority of Volcano's outstanding shares approved the Merger, Plaintiffs must plead facts from which it reasonably can be inferred that those stockholders were interested, coerced, or not fully

---

[72] In fact, in *Zuckerberg*, Chancellor Bouchard cited both *Gantler* and *Corwin* and recognized that although a statutorily required vote does not constitute ratification, it can have same cleansing effect. *Zuckerberg*, 124 A.3d at 62-63 ("In *Gantler*, the Supreme Court held that the scope of 'the shareholder ratification doctrine must be limited . . . to circumstances where a fully informed shareholder vote approves director action that does *not* legally require shareholder approval in order to become legally effective.' . . . *Corwin v. KKR* . . . confirmed that stockholder approval from a statutorily required vote can be used to invoke the business judgment rule the same way [stockholder ratification] can . . . ." (footnotes omitted) (quoting *Gantler*, 965 A.2d at 713)). That same principle applies to a first-step tender offer under Section 251(h).

informed in accepting the Tender Offer to avoid application of the business judgment rule. The Complaint does not allege—and Plaintiffs do not argue—that the Volcano stockholders that tendered 89.1% of the Company's outstanding shares into the Tender Offer were interested or coerced. Instead, Plaintiffs allege that "Defendants have failed to disclose all material information regarding the [Merger]."[73] Aside from that conclusory statement, the Complaint largely is devoid of allegations regarding Volcano's Merger-related disclosures to its stockholders. Many of those allegations were brought in Plaintiffs' original, pre-Merger complaints. Plaintiffs withdrew those claims after Defendants released supplemental disclosures, and the operative Complaint reflects those withdrawals. As a result, Defendants contend that Plaintiffs have conceded that Volcano's stockholders were fully informed as to the Merger.[74]

Plaintiffs point out, however, that the Complaint contains allegations that the Board was not fully informed regarding the Merger and Goldman's interest in the Call Spread Transactions. It follows, according to Plaintiffs, that if the Board was

---

[73] Compl. ¶ 153.

[74] Oral Arg. Tr. 16 ("The bottom line is after the supplemental disclosures were made, the plaintiffs voluntarily withdrew their application for preliminary injunction, later filed the amended complaint that has no disclosure claims in it. We submit that they've waived the opportunity to assert them at this point, and they're just not there. They can't amend their complaint by making arguments in their briefing or otherwise.").

42

not fully informed as to certain aspects of the Merger, Volcano's stockholders also were not fully informed, as they received their information regarding the Merger from the Board's Recommendation Statement.[75] Because I conclude that Volcano's stockholders were fully informed as to all material facts regarding the Merger, I need not decide whether Plaintiffs waived their disclosure-based arguments.

### a. Legal standard for determining whether Volcano's stockholders were fully informed

"For stockholder approval of any corporate action to be valid, the [approval] of the stockholders must be fully informed."[76] Evaluating "[w]hether shareholders are 'fully-informed'" as to a particular transaction depends on whether those stockholders were apprised of "all material information" related to that transaction.[77] "An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding [whether to

---

[75] Oral Arg. Tr. 63-64 ("I would submit that it's . . . fairly obvious that if the board wasn't fully informed, the stockholders weren't fully informed.").

[76] *KKR*, 101 A.3d at 999.

[77] *Solomon v. Armstrong*, 747 A.2d 1098, 1127-28 (Del. Ch. 1999) (quoting *Santa Fe*, 669 A.2d at 66).

approve the challenged transaction]."[78]  "Stated another way, there must be 'a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable stockholder as having significantly altered the "'total mix' of information made available."[79]  Although a plaintiff generally bears the burden of proving a material deficiency when asserting a duty of disclosure claim,[80] a defendant bears the burden of demonstrating that the stockholders were fully informed when relying on stockholder approval to cleanse a challenged transaction.[81]

---

[78]   *Rosenblatt v. Getty Oil Co.*, 493 A.2d 929, 944 (Del. 1985) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976) and adopting *TSC*'s materiality standard as Delaware law).

[79]   *Skeen v. Jo-Ann Stores, Inc.*, 750 A.2d 1170, 1172 (Del. 2000) (quoting *Louden v. Archer–Daniels–Midland Co.*, 700 A.2d 135, 142 (Del. 1997)).

[80]   *In re Siliconix Inc. S'holders Litig.*, 2001 WL 716787, at *9 (Del. Ch. June 21, 2001).

[81]   *KKR*, 101 A.3d at 999 (citing *Bershad*, 535 A.2d at 846); *see also Solomon*, 747 A.2d at 1128 ("In their analyses of Delaware's disclosure jurisprudence, there appears to be some dispute among the litigants over who bears the burden of proof on disclosure issues.  The answer is that it depends on which type of disclosure claim is made by whom.  As far as claims of material misstatements, omissions and coercion go, the law is clear that plaintiff bears the burden of proof that disclosure was inadequate, misleading, or coercive. On the other hand, when it comes to claiming the sufficiency of disclosure and the concomitant legal effect of shareholder ratification after full disclosure (*e.g.,* claim extinguishment, the retention of the business judgment rule presumptions, or the shift of the burden of proof of entire fairness from the defendant to the plaintiff) it is the defendant who bears the burden.").

44

**b.** **Defendants have carried their burden of demonstrating that Volcano's stockholders were fully informed in approving the Merger**

At oral argument, Plaintiffs agreed that the allegation in their Complaint regarding Volcano's deficient disclosure is based solely on their contention "that neither Volcano's board nor its stockholders were fully informed because Goldman failed to disclose sufficiently detailed information regarding the extent of the deterioration of the value of the [W]arrants over time."[82]  More specifically, Plaintiffs claim that although the Board and Volcano's stockholders were apprised of the fact that the Warrants' value decreased over time, Goldman never disclosed that the Warrants' value decreased "exponentially."[83]  According to Plaintiffs, this information is material because it indicates a possible conflict of interest between Volcano's stockholders and Goldman, as "it was in Goldman Sachs' direct financial interest that a change in control transaction, involving all or nearly all cash, be consummated as soon as possible, regardless of whether the transaction maximizes Volcano stockholder value."[84]  In other words, Plaintiffs allege that Volcano's stockholders were not fully informed that the exponential decrease in the Warrants' value over time may have given Goldman an incentive to seek a sale

---

[82]    Oral Arg. Tr. 63, 67.

[83]    *See* Compl. ¶¶ 15, 63, 65, 76.

[84]    *Id.* ¶ 15.

45

as soon as possible when waiting for a better offer or deciding not to sell the Company at all may have been in Volcano's stockholders' interests.

The Board, however, disclosed that "[i]f the [Merger was] announced at a later date, assuming other inputs remain the same, the value of the [Warrants] would decrease over time as the result of option time decay until the [W]arrants' expiration."[85] Based on that disclosure, Volcano's stockholders were aware that Goldman's payout under the Warrants would have decreased if the Merger was consummated at a later date. Volcano's stockholders also were aware that the Warrants eventually would expire. Plaintiffs' argument that the Merger-related disclosures were materially deficient, therefore, boils down to the fact that the Board did not describe the decline in the Warrants' value as "exponential."

Assessing materiality is a difficult practice that requires balancing the benefits of additional disclosures against the risk that insignificant information may dilute potentially valuable information.[86] Here, Volcano announced that Goldman had an interest in the Warrants and that their value would decline until

---

[85] Recommendation Statement Supplement.

[86] *See Solomon*, 747 A.2d at 1128 ("The determination of the materiality of an alleged omission or misstatement 'requires a careful balancing of the potential benefits of disclosure against the resultant harm.' The theory goes that there is a risk of information overload such that shareholders' interests are best served by an economy of words rather than an overflow of adjectives and adverbs in solicitation statements." (footnote omitted) (quoting *Arnold v. Soc'y for Sav. Bancorp, Inc.*, 650 A.2d 1270, 1279 (Del. 1994))).

they expired "over a series of expiration dates in 2018."[87]  A reasonable stockholder could infer from this information that, all else held equal, Goldman would have preferred to consummate a deal sooner rather than later.  Assuming the Warrants truly did decay at an exponential—rather than "linear" or "gradual"—rate, the Board's disclosure of this information only would change the degree of Goldman's interest.  Thus, although a more exhaustive disclosure of the Warrants' value decay over time may have been "somewhat more informative,"[88] a reasonable stockholder would not have viewed that fact as significantly altering the total mix of available information regarding the relationship between Goldman's interests in the Call Spread Transactions and the Merger.[89]

## C.    The Complaint Fails to State a Claim for Waste

Because Volcano's fully informed, uncoerced, disinterested stockholders approved the Merger by tendering a majority of the Company's outstanding shares into the Tender Offer, the business judgment rule irrebuttably applies.  The Merger, therefore, only can be challenged on the basis that it constituted waste.  In other words, the Complaint must plead that the Merger "cannot be attributed to any

---

[87]    Recommendation Statement at 31.

[88]    *Kahn v. Lynch Commc'n Sys., Inc.*, 669 A.2d 79, 89 (Del. 1995).

[89]    *Siliconix*, 2001 WL 716787, at *9.

47

rational business purpose."[90] The Complaint fails to plead that the Merger constituted waste. And, even if it did, I note that "it [is] logically difficult to conceptualize how a plaintiff can ultimately prove a waste or gift claim in the face of a decision by fully informed, uncoerced, independent stockholders to ratify the transaction," given that "[t]he test for waste is whether any person of ordinary sound business judgment could view the transaction as fair."[91] Because the Merger did not constitute waste, the Complaint fails to state a valid breach of fiduciary duty claim against the Board.

### D. The Complaint Fails to State a Claim for Aiding and Abetting

Finally, Plaintiffs assert that Goldman aided and abetted the Board's fiduciary duty breaches. To state a valid aiding and abetting claim, Plaintiffs must allege "(1) the existence of a fiduciary relationship, (2) a breach of the fiduciary's duty, . . . (3) knowing participation in that breach by the defendants,' and (4) damages proximately caused by the breach."[92] "An aiding and abetting claim[, however,] 'may be summarily dismissed based upon the failure of the breach of

---

[90] *Cede & Co.*, 634 A.2d at 361 (internal quotation marks omitted).

[91] *Harbor Fin.*, 751 A.2d at 901 (citing *Michelson*, 407 A.2d at 224); *see also Attenborough*, 2016 WL 2765312, at *1.

[92] *Malpiede v. Townson*, 780 A.2d 1075, 1096 (Del. 2001) (quoting *Penn Mart Realty Co. v. Becker*, 298 A.2d 349, 351 (Del. Ch. 1972)).

48

fiduciary duty claims against the director defendants.'"[93]  Further, in *Attenborough*, the Supreme Court reiterated the high burden that a plaintiff faces in attempting to plead facts from which a court could reasonably infer that a financial advisor acted with the requisite scienter for an aiding and abetting claim.[94]  Just as in that case, "[n]othing in this record comes close to approaching the sort of [financial advisor misconduct] at issue in *RBC Capital Markets*."[95]  The Complaint, therefore, fails to state a valid aiding and abetting claim against Goldman.

## III.    CONCLUSION

For the foregoing reasons, Defendants' Motions are granted, and the Complaint is dismissed.

**IT IS SO ORDERED**.

---

[93]   *KKR*, 101 A.3d at 1003 (quoting *Meyer v. Alco Health Servs. Corp.*, 1991 WL 5000, at *4 (Del. Ch. Jan. 17, 1991)); *see also Attenborough*, 2016 WL 2765312, at *2 ("Having correctly decided, however, that the stockholder vote was fully informed and voluntary, the Court of Chancery properly dismissed the plaintiffs' claims against all parties.").

[94]   *Attenborough*, 2016 WL 2765312, at *2.

[95]   *Id.* (citing *RBC Capital Mkts. v. Jervis*, 129 A.3d 816, 865 (Del. 2015) (finding, in the context of a change-of-control transaction, that "[t]he claim for aiding and abetting was premised on [the financial advisor]'s 'fraud on the Board,' and that RBC aided and abetted the Board's breach of duty where, for [the financial advisor]'s own motives, it 'intentionally duped' the directors into breaching their duty of care.  The record evidence amply supports the trial court's conclusion that [the financial advisor] purposely misled the Board so as to proximately cause the Board to breach its duty of care.")).