# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| IN RE ESSENDANT, INC. | ) | **CONSOLIDATED** |
| STOCKHOLDER LITIGATION | ) | **C.A. No. 2018-0789-JRS** |

## MEMORANDUM OPINION

Date Submitted: October 2, 2019
Date Decided: December 30, 2019

Blake A. Bennett, Esquire of Cooch and Taylor, P.A., Wilmington, Delaware; Juan E. Monteverde, Esquire and Miles D. Schreiner, Esquire of Monteverde & Associates PC, New York, New York; and Donald J. Enright, Esquire and Elizabeth K. Tripodi, Esquire of Levi & Korsinsky, LLP, Washington, DC, Attorneys for Plaintiffs Joseph Pietras and Michael J. Sultan.

Robert S. Saunders, Esquire, Arthur R. Bookout, Esquire and Lilianna Anh P. Townsend, Esquire of Skadden, Arps, Slate, Meagher & Flom LLP, Wilmington, Delaware, Attorneys for Individual Defendants Richard D. Phillips, Charles K. Crovitz, Dennis J. Martin, Susan J. Riley, Alexander M. Schmelkin, Stuart A. Taylor, II, Paul S. Williams and Alex D. Zoghlin.

Gregory P. Williams, Esquire, Lisa A. Schmidt, Esquire, Matthew D. Perri, Esquire and Angela Lam, Esquire of Richards, Layton & Finger, P.A., Wilmington, Delaware and Matthew Solum, P.C., Ian Spain, Esquire of Kirkland & Ellis LLP, New York, New York, Attorneys for the Staples Defendants Sycamore Partners, Staples, Inc., Egg Parent Inc. and Egg Merger Sub Inc.

**SLIGHTS, Vice Chancellor**

In the spring of 2018, Essendant Inc. (or the "Company") signed a merger agreement with Genuine Parts Company ("GPC") whereby Essendant would combine with a GPC affiliate. The agreement contemplated a stock-for-stock transaction that would result in Essendant stockholders owning 49% of the combined company. According to Essendant's financial advisors, the transaction would represent a value range of $13.30–$23.90 per share for Essendant stockholders, including $8.35–$11.25 per share from anticipated synergies.

Shortly after signing the GPC merger agreement, the Essendant board of directors (the "Essendant Board") received an all cash offer to acquire Essendant from Sycamore Partners ("Sycamore"). As Sycamore was communicating with the Essendant Board, it was also making a push in the open market to acquire a substantial (ultimately 11.16%) stake in the Company. The Essendant Board responded by adopting a poison pill. After calming the waters, the Essendant Board entertained further discussions with Sycamore and eventually decided to terminate the GPC merger agreement and accept Sycamore's $12.80 per share all cash offer, which represented a 51% premium to Essendant's unaffected stock price (the "Sycamore merger"). The transaction closed on January 31, 2019.

Essendant now faces litigation on two fronts. *First*, GPC has sued Essendant for breaches of the GPC merger agreement. That case is pending in this court.[1] *Second*, in this case, a putative class of Essendant stockholders has sued the Essendant Board and Sycamore for breaches of fiduciary duty, waste and aiding and abetting breaches of fiduciary duty. The gravamen of the Complaint is that the Essendant Board succumbed to pressure from Sycamore and improperly turned GPC away in favor of an inferior proposal from Sycamore. Defendants have moved to dismiss under Rule 12(b)(6) for failure to state viable claims.

Essendant's charter contains an exculpatory provision, as authorized under 8 *Del. C.* § 102(b)(7), that protects the Essendant Board from monetary liability for breaches of the duty of care.[2] Accordingly, to state litigable claims against the Essendant Board, Plaintiffs must well plead that a majority of the members of the Essendant Board breached the duty of loyalty. As explained below, Plaintiffs have failed to strike that mark. Specifically, they have failed to well plead either that the Essendant Board was dominated and controlled by Sycamore or that a majority of the Essendant Board acted out of self-interest or in bad faith when approving the

---

[1] *See Genuine Parts Co. v. Essendant Inc.*, 2019 WL 4257160 (Del. Ch. Sept. 9, 2019).

[2] *See* Essendant Inc., Solicitation/Recommendation Statement (Schedule 14D-9) 12 (Sept. 24, 2018) ("Essendant 14D-9"); *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 179 (Del. 2006) (noting the trial court may take judicial notice of facts in SEC filings that are "*not subject to reasonable dispute*") (emphasis in original).

Sycamore merger. Plaintiffs likewise have failed to plead viable breach claims against Essendant's CEO notwithstanding that the CEO cannot avail himself of exculpation. This leaves Plaintiffs with only a claim of waste against the Essendant fiduciaries, and their Complaint does not come close to stating that claim.

As for Sycamore, Plaintiffs do not well plead that Sycamore's less than 12% stake in Essendant at the time of the events in question was coupled with the kind of influence that could justify a finding that Sycamore was Essendant's controlling stockholder. Nor have Plaintiffs well pled that Sycamore knowingly participated in a breach of duty by any Essendant fiduciary in order to sustain an aiding and abetting claim.

Defendants' Motions to Dismiss must be granted.

## I. FACTUAL BACKGROUND

I draw the facts from the allegations in the Verified Amended Class Action Complaint (the "Complaint"),[3] documents incorporated by reference or integral to that pleading and judicially noticeable facts.[4] For purposes of these Motions to

---

[3] Verified Am. Class Action Compl. ("Compl.") (D.I. 9).

[4] *See Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 860 A.2d 312, 320 (Del. 2004) (quoting *In re Santa Fe Pac. Corp. S'holder Litig.*, 669 A.2d 59, 69 (Del. 1995)) (noting that on a motion to dismiss, the court may consider documents that are "incorporated by reference" or "integral" to the complaint); D.R.E. 201–02 (codifying Delaware's judicial notice doctrine).

Dismiss, I accept as true the Complaint's well-pled factual allegations and draw all reasonable inferences in Plaintiffs' favor.[5]

## A. Parties and Relevant Non-Parties

Plaintiffs, Joseph Pietras and Michael J. Sultan, were Essendant stockholders during the relevant period.[6] They bring this action on behalf of themselves and all similarly situated former Essendant stockholders.[7]

Non-party, Essendant, is a Delaware corporation with its principal offices in Deerfield, Illinois.[8] Prior to the Sycamore merger, Essendant was a national wholesale distributor of office supplies and equipment.[9]

Defendant, Richard D. Phillips, was Essendant's President, CEO and member of the Essendant Board during the relevant period.[10] Defendant, Charles K. Crovitz, was the Chairman of the Essendant Board.[11] Defendants, Dennis J. Martin, Susan J.

---

[5] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002).

[6] Compl. ¶ 17.

[7] Compl. ¶¶ 1, 41.

[8] Compl. ¶ 31.

[9] *Id.*

[10] Compl. ¶ 18.

[11] Compl. ¶ 19.

Riley, Alexander M. Schmelkin, Stuart A. Taylor, II, Paul S. Williams and Alex D. Zoghlin were each members of the Essendant Board.[12]

Defendant, Sycamore, is a private equity firm specializing in retail and consumer investments with its principal offices in New York, New York.[13] Sycamore owns Defendant, Staples, Inc. ("Staples"), a Delaware corporation that provides office supplies and technology products and services for business customers and consumers.[14] Staples is an affiliate of Defendants, Egg Parent Inc. and Egg Merger Sub Inc.[15]

Non-party, GPC, is a Georgia corporation engaged in the distribution of automotive replacement parts, industrial parts and business products.[16] GPC wholly-owns S.P. Richards Co. ("SPR"), a company engaged in the wholesale distribution of office supply products in the United States and Canada.[17]

---

[12] Compl. ¶¶ 18–26.

[13] Compl. ¶ 27.

[14] Compl. ¶ 28.

[15] *Id.*

[16] Compl. ¶ 32.

[17] Compl. ¶ 33.

## B. The Essendant–GPC Merger

Beginning in the fall of 2017, the Essendant Board began discussing a potential business combination with GPC's subsidiary, SPR (the "GPC merger").[18] Essendant's preliminary estimates suggested that the GPC merger would unlock more than $75 million in net cost synergies, 90% of which Essendant expected to realize within two years post-closing.[19] Additionally, the Essendant Board expected the GPC merger to generate more than $100 million in working capital improvements.[20] Essendant's financial advisor, Citigroup Global Markets Inc. ("Citi"), conducted a pro forma discounted cash flow analysis ("DCF") that calculated "an implied equity value reference range for the pro forma combined company of $13.30 to $23.90 per share (including a synergies range of approximately $8.35 to $11.25 per share[)]."[21]

While the economics of the GPC merger looked promising on paper, both parties anticipated that the proposed transaction would confront serious antitrust compliance issues.[22] Given the considerable resources both parties expected to

---

[18] Compl. ¶ 52.

[19] Compl. ¶ 53.

[20] *Id.*

[21] Compl. ¶ 54.

[22] Compl. ¶ 56.

expend in pursuing and closing a business combination, including the pursuit of regulatory approvals, GPC requested assurances from the Essendant Board that it was committed to consummating the GPC merger before the parties began negotiating in earnest.[23] In response, the Essendant Board assured GPC that it had no interest in pursuing a transaction with any other party and that no other party had expressed interest in pursuing a transaction with Essendant.[24]

To shore up this understanding, GPC included a "non-solicitation" provision in the GPC merger agreement whereby Essendant promised (i) not to knowingly encourage a competing acquisition proposal, (ii) to terminate all existing negotiations related to a competing transaction and (iii) to notify GPC within 24 hours after receipt of any competing proposal.[25] As is customary, the non-solicitation provision did not prohibit Essendant from considering alternative proposals. Indeed, in accordance with Delaware law, the Essendant Board was free to consider unsolicited proposals provided that any new suitor entered into a confidentiality agreement with terms no more favorable to the suitor than those extended to GPC in the GPC merger agreement.[26] Additionally, because antitrust

---

[23] *Id.*

[24] *Id.*

[25] Compl. ¶ 57.

[26] *Id.*

clearance was a concern shared by both parties, GPC required that Essendant promise to use its reasonable best efforts to seek antitrust approval of the GPC merger.[27]

On April 12, 2018, Essendant and GPC announced they had entered into the GPC merger agreement.[28] The agreement contemplated that SPR would spin off from GPC and then merge with Essendant.[29] If the GPC merger had closed, GPC stockholders would have owned approximately 51% of the combined company and Essendant stockholders would have owned the remaining 49%.[30]

## C. Sycamore Makes an Offer and the Essendant Board Terminates the GPC Merger Agreement

On April 9, 2018, three days before Essendant and GPC signed the GPC merger agreement, representatives of Sycamore called Phillips to express Sycamore's interest in acquiring the Company.[31] Sycamore saw in Essendant a

---

[27] *Id.*

[28] Compl. ¶ 48.

[29] *Id.*

[30] Compl. ¶ 49.

[31] Compl. ¶¶ 2, 12, 57–58, 82. The extent to which Essendant and Sycamore were talking before the GPC merger agreement was signed is in dispute in the GPC/Essendant litigation. By extension, that fact is also in dispute in this litigation as many of the allegations in the Complaint here parrot allegations in GPC's complaint. *Compare* Compl. ¶ 33, *Genuine Parts Co.*, (C.A. No. 2018-0730-JRS), 2019 WL 4257160 (the "GPC Compl.") (alleging Essendant "conveyed to Sycamore that it would be open to receiving a revised offer from

chance to protect its $6.9 billion investment in Staples and "create a combined entity that [would] be a powerhouse in the office supply industry."[32]

Essendant did not immediately inform GPC of Sycamore's overture.[33] Indeed, the first time GPC learned of Sycamore's expression of interest was on May 31, 2018, seven weeks after Essendant and GPC executed the GPC merger agreement.[34]

As GPC remained in the dark, on April 17, 2018, Sycamore communicated its formal acquisition proposal to acquire Essendant for $11.50 per share in an all cash transaction ("Proposal 1").[35] On April 24, the Essendant Board rejected Proposal 1 after determining it was unlikely to lead to a superior proposal when compared with the GPC merger agreement.[36] In communicating its rejection to Sycamore, the Essendant Board made clear it would "be open to receiving a revised offer."[37]

---

Sycamore"), *with* Compl. ¶ 66 ("Essendant informed 'Sycamore that it would be open to receiving a revised offer from Sycamore.'") (quoting GPC Compl. ¶ 33).

[32] Compl. ¶ 82.

[33] Compl. ¶¶ 12, 59.

[34] Compl. ¶ 62.

[35] Compl. ¶ 9.

[36] Compl. ¶¶ 9, 64.

[37] Compl. ¶ 66.

Essendant's 10-Q, dated April 25, did not mention Sycamore's Proposal 1; instead, the Essendant Board disclosed that it was committed to closing the GPC merger.[38]

On April 29, 2018, Sycamore communicated its "renewed" proposal ("Proposal 2") to the Essendant Board at the same $11.50 price per share that comprised Proposal 1.[39] This time, however, the Essendant Board determined that Proposal 2 *was* "reasonably likely to lead to a superior acquisition proposal."[40] As a result, on May 31, Essendant notified GPC of its determination that Sycamore's Proposal 2 was a superior proposal and invited GPC to exercise its matching rights.[41] In response, on May 7, GPC offered additional consideration in the form of a contingent value right (a cash payment at the end of 2019 of up to $4 per share).[42]

In the midst of its negotiations with Essendant, Sycamore began acquiring Essendant's stock on the open market.[43] On May 16, Sycamore filed a Schedule 13D

---

[38] Compl. ¶ 65.

[39] Compl. ¶ 67.

[40] Compl. ¶¶ 67–68. As support for its apparent change of heart, the Essendant Board explained that it had determined, based on recently discovered information, that the GPC merger was unlikely to be approved by antitrust regulators. Compl. ¶ 79. According to Plaintiffs, the explanation was pretextual. *Id.*

[41] Compl. ¶ 62.

[42] Compl. ¶ 71.

[43] Compl. ¶ 74.

revealing it had acquired 9.9% of Essendant's stock.[44]   For reasons unclear, Essendant did not negotiate a standstill agreement with Sycamore.[45]   Instead, in response to Sycamore's Schedule 13D filing, on May 17, the Essendant Board adopted a rights plan.[46]   Sycamore's open market purchases stopped on May 21, 2018, after Sycamore had acquired 11.16% of Essendant's outstanding shares.[47] Meanwhile, in order to allow more time to negotiate with Sycamore, it is alleged that the Essendant Board slow-walked its efforts to obtain regulatory approvals of, and customer support for, the GPC merger notwithstanding its commitment to GPC to move "promptly" on both fronts.[48]

## D. The Sycamore Merger

After more negotiations and due diligence, on September 10, 2018, Essendant announced that it had agreed to accept Sycamore's acquisition proposal of $12.80 per share in cash (the "Final Proposal").[49]   Earlier that morning, Essendant's stock

---

[44] *Id.*

[45] Compl. ¶ 12.

[46] *See* Essendant 14D-9 at 20; Compl. ¶ 76.

[47] Compl. ¶¶ 74–75.

[48] Compl. ¶¶ 77–78.

[49] Compl. ¶ 80.

had been trading at $14.24 per share.[50]  Thus, Sycamore's Final Proposal represented an 11% discount to Essendant's then-trading stock price.[51]  But that price was hardly "unaffected"; the market had reacted favorably to the announcement of the GPC merger weeks earlier (with a trading high of $16.63 per share), and it was still high on that transaction when the Sycamore merger was announced.[52]

Essendant again extended a matching right to GPC.  This time, however, GPC chose not to match, so the GPC merger agreement terminated after the three-day match period.[53]  This triggered Essendant's obligation to pay a $12 million termination fee to GPC.[54]

Citi served as Essendant's financial advisor throughout its negotiations with both GPC and Sycamore.[55]  With respect to the GPC merger, Citi calculated a pro forma combined company equity value range of $13.30 to $23.90 per share,[56]

---

[50] *Id.*

[51] *Id.*

[52] Compl. ¶ 85.

[53] Genuine Parts Company, Current Report (Form 8-K) (Sept. 11, 2018) ("GPC anticipates that the Merger Agreement will terminate at the end of the three-day match period.").

[54] Compl. ¶ 130.

[55] Compl. ¶ 86.

[56] *Id.*

including synergy values of $8.35 to $11.25 per share.[57]  Even though it opined that the GPC merger presented a value range greater than the all-cash Sycamore merger, Citi opined that the Sycamore merger was fair from a financial perspective to Essendant's stockholders.[58]  According to its disclosures to stockholders, the Essendant Board chose the Sycamore cash offer over the GPC stock-for-stock offer, in part, due to "risk related to continued secular decline in the Company's industry" that threatened the long-term success of the combined company.[59]

The Sycamore merger proceeded in two steps.[60]  On January 31, 2019, Sycamore and Essendant announced the successful completion of a tender offer in which 79.7% of Essendant's stockholders tendered their shares to Sycamore in exchange for $12.80 per share in cash.[61]  The tender offer was followed by a cash-out merger at the same price.[62]

According to Plaintiffs, Essendant's disclosures regarding the Sycamore merger omitted the following material information:

---

[57] *Id.*

[58] Essendant 14D-9 at 26.

[59] *Id.* at 27.

[60] 8 *Del. C.* § 251(h).

[61] Compl. ¶ 90.

[62] Essendant 14D-9 at 2.

- That the Essendant Board had represented to GPC that it had no interest in any merger partner other than GPC;[63]
- That the Essendant Board had indicated to Sycamore—after rejecting Proposal 1—that Essendant "would be open to receiving a revised offer" notwithstanding its commitment to GPC not to solicit other offers;[64]
- Whether Essendant "did or did not" contact its customers to build support for the GPC merger;[65]
- That Essendant's financial advisor, Citi, advised the Essendant Board while laboring under a conflict of interest arising from its anticipated post-closing work for Staples after the Sycamore merger;[66]
- The precise nature of Essendant's executive officers' and directors' negotiations with Sycamore over "possible ongoing roles with Staples";[67] and
- The precise date that Essendant's financial projections—used in Citi's fairness opinion—were prepared.[68]

---

[63] Compl. ¶ 94.

[64] Compl. ¶ 95.

[65] Compl. ¶ 96.

[66] Compl. ¶¶ 101–103. While Plaintiffs acknowledge the Essendant 14D-9 disclosed (i) Citi's current work for Essendant for which Citi received $2.5 million, (ii) Citi's previous work for Staples for which Citi received $5 million and (iii) the fact that Citi anticipated doing additional work for Sycamore after the Sycamore merger, Plaintiffs allege the specific "amount of fees Citi expects to receive *in the near future*" was omitted and material to Essendant stockholders. *See* Compl. ¶ 103 ("[W]ithout full and complete quantification of all *expected* fees—not just those that have been paid out as of the fairness opinion— stockholders cannot properly assess the breadth of the conflict.").

[67] Compl. ¶ 104 (internal quotations omitted). While Plaintiffs acknowledge Essendant disclosed that some of Essendant's officers and directors expected to have ongoing roles in the new company, Plaintiffs fault the disclosure for omitting "precisely which" executives had these negotiations and "when such discussions occurred." *Id.*

[68] Compl. ¶ 105.

14

Compounding the impact of these omissions, Plaintiffs allege the following affirmative misstatements were included in Essendant's 14D-9:

- The disclosure "create[d] the impression that there was some newly-discovered, significant risk of gaining FTC approval for the GPC [merger]";[69] and
- Essendant's statement that a federal securities action related to the transaction "was voluntarily dismissed" led stockholders to "incorrectly believe that all stockholder actions challenging the [Sycamore merger] had been dismissed."[70]

## E. Procedural Posture

On October 31, 2018, Plaintiffs filed a class action complaint against the Essendant Board alleging breaches of fiduciary duties flowing from its failure to obtain the highest value reasonably available for Essendant by approving and recommending the Sycamore merger in a decision that amounted to corporate

---

[69] Compl. ¶¶ 97–100. The Complaint alleges the Essendant Recommendation Statement "painted an inaccurate picture regarding the regulatory approval risk surrounding the GPC [merger]." Compl. ¶ 100. Specifically, Plaintiffs allege the following statements in the Essendant 14D-9, taken together, were misleading: (i) that the Essendant Board reviewed an analysis provided by its legal counsel outlining regulatory approval developments in the GPC merger; (ii) that Essendant's counsel updated the Essendant Board on the FTC's review of documents related to the GPC merger and counsel's estimation of how those documents would affect the FTC's review; (iii) that Essendant's advisors compared the "risks and benefits of a transaction with Staples compared to the [GPC merger], including, among other things, the financial and regulatory aspects of each"; and (iv) that the Essendant Board considered the relative "risks of execution" of each business combination. Compl. ¶¶ 97–98. The net effect of these disclosures, allegedly, is to create "the impression that there was some newly-discovered, significant risk of gaining FTC approval." Compl. ¶ 99.

[70] Compl. ¶ 106.

waste.[71] The initial complaint also alleged Sycamore and Staples aided and abetted the Essendant Board's breaches.[72] After Defendants moved to dismiss, Plaintiffs amended the complaint to add a claim against Sycamore for breaching its fiduciary duties as a controlling stockholder and against the Essendant Board for aiding and abetting Sycamore's alleged breach.[73]

On March 13, 2019, the court entered a consolidation order as among separate putative class complaints.[74] On April 2, 2019, Defendants moved to dismiss the lead Complaint under Court of Chancery Rule 12(b)(6).[75] Following briefing and oral argument, Defendants' Motions to Dismiss were submitted for decision.[76]

## II. ANALYSIS

"The standards governing a motion to dismiss for failure to state a claim are well settled: (i) all well-pleaded factual allegations are accepted as true; (ii) even

---

[71] Class Action Compl. (D.I. 1) ¶¶ 90–95, 101–06.

[72] Class Action Compl. (D.I. 1) ¶¶ 96–100.

[73] Compl. ¶¶ 114–17, 123–27.

[74] D.I. 12.

[75] D.I. 15 (the Essendant Board's Motion to Dismiss); D.I. 16 (Sycamore's Motion to Dismiss).

[76] D.I. 38. This Court addressed the separate dispute between GPC and Essendant earlier this year in a decision on Essendant's Motion to Dismiss. *See Genuine Parts Co.*, 2019 WL 4257160 (denying the Motion to Dismiss upon concluding that GPC had stated a claim for breach of the GPC merger agreement).

vague allegations are 'well-pleaded' if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the non-moving party; and (iv) dismissal is inappropriate unless the 'plaintiff would not be entitled to recovery under any reasonably conceivable set of circumstances susceptible of proof.'"[77]  Despite this plaintiff-friendly standard, the court need not accept "every strained interpretation of the allegations proposed by the plaintiff."[78]  Nor must the court credit "conclusory allegations unsupported by specific facts or . . . [requiring] unreasonable inferences."[79]

The Complaint brings three counts against the Essendant Board, all of which arise from Essendant's termination of the GPC merger agreement in favor of the Sycamore merger.  In Count I, Plaintiffs allege the Essendant Board breached its fiduciary duties by failing to obtain the highest value reasonably available for Essendant.[80]  In Count IV, Plaintiffs allege the Essendant Board aided and abetted

---

[77] *Savor, Inc.*, 812 A.2d at 896–97 (internal citations omitted).

[78] *In re Gen. Motors*, 897 A.2d at 168.

[79] *Lyons Ins. Agency Inc. v. Wilson*, 2018 WL 481641, at *3 (Del. Ch. Jan. 19, 2018) (internal citation omitted).

[80] Compl. ¶¶ 108–13.

Sycamore's breach of fiduciary duties as a controlling stockholder.[81]   Count V alleges the Sycamore merger constituted waste.[82]

The Complaint also names Sycamore, Staples and various transaction-specific entities as Defendants.  In Count II, Plaintiffs allege Sycamore was Essendant's controlling stockholder and that Sycamore "use[d] its control against the interests of the non-controlling stockholders" by "pressuring . . . the Essendant [Board] to accept its inadequate [] offer."[83]   In Count III, Plaintiffs allege Sycamore, Staples, Egg Parent Inc. and Egg Merger Sub Inc. aided and abetted the Essendant Board's breaches of fiduciary duties as "active and knowing participants" in the Essendant Board's wrongful conduct.[84]

My analysis of the claims against the Essendant Board and its CEO begins by focusing on the viability of the affirmative claims as pled in light of Essendant's exculpatory charter provision.  Because Plaintiffs have not stated litigable *affirmative* claims under Delaware law, I need not reach the validity of the *Corwin*

---

[81] Compl. ¶¶ 123–27.

[82] Compl. ¶¶ 128–33.

[83] Compl. ¶¶ 114–17.

[84] Compl. ¶¶ 118–22.

*defense* as asserted by all Defendants.[85]  As explained below, the affirmative claims against Sycamore, Staples and their affiliates likewise fail as a matter of law.

### A. Counts I, IV and V—Breach of Fiduciary Duties Against the Essendant Board and CEO

Count I alleges the Essendant Board members (including Phillips as a board member)[86] breached their fiduciary duties by "caving to the will of Sycamore and knowingly and willfully allowing the GPC [merger] to be sabotaged by Sycamore so that [Sycamore] could acquire Essendant at an unfair price."[87]  As our Supreme Court made clear in *In re Cornerstone Therapeutics Inc. S'holder Litig.*, given Essendant's exculpatory charter provision, in order to survive the Essendant Board's Motion to Dismiss, the Complaint must state valid, non-exculpated claims.[88]  In other words, "regardless of the underlying standard of review for the board's conduct," the Complaint must "invoke loyalty and bad faith claims."[89]

---

[85] *Corwin v. KKR Fin. Hldgs.*, 125 A.3d 304 (Del. Ch. 2015), *aff'd*, 125 A.3d 304 (Del. 2015) (holding that a fully informed, uncoerced vote of disinterested stockholders in favor of a transaction can "cleanse" breaches of fiduciary duty and subject the challenged transaction to deferential review under the business judgment rule).

[86] I address the claims against Phillips as CEO separately below.

[87] Compl. ¶ 111.

[88] 8 *Del. C.* § 102(b)(7); *In re Cornerstone Therapeutics Inc. S'holder Litig.*, 115 A.3d 1173, 1081 (Del. 2015).

[89] *Cornerstone*, 115 A.3d at 1175, 1179; *Malpiede v. Townson*, 780 A.2d 1075, 1094 (Del. 2001).

19

In its attempt to overcome its pleading burden under *Cornerstone*, the Complaint blurs the lines between (i) loyalty claims against the Essendant Board members based on their having acceded to the will of Sycamore as a controlling stockholder at the expense of the other stockholders and (ii) claims that rest on allegations that these fiduciaries operated under some broader conflict of interest.[90] These, of course, are different claims that implicate different factual and legal predicates. To state a claim that the Essendant Board was dominated and controlled by Sycamore, the Complaint must well plead that, notwithstanding Sycamore's status as a distinctly minority blockholder, it was, nevertheless, Essendant's controlling stockholder.[91] These allegations, such as they are, must be measured against Delaware's well settled law on controlling stockholders.[92] The question of

---

[90] Compl. ¶¶ 12, 111(a) (The Essendant Board "cav[ed] to the will of Sycamore."), 111(d) (The Essendant Board "plac[ed] Sycamore's interests ahead of the interests of the Company's non-controlling stockholders."), 104 ("The Recommendation Statement fails to provide sufficient information for stockholders to properly assess the conflict of interest certain executive officers and directors faced [with respect to the Sycamore merger]").

[91] Plaintiffs are also obliged to plead that the controller exercised influence over *each* of the board members named as defendants; group pleading is not sufficient to state a claim of breach of duty against an individual fiduciary. *Cornerstone*, 115 A.3d at 1182–83 (holding that even if a controller is proven to have breached his duty of loyalty, the court cannot "presume that an independent director is not entitled to the protection of the business judgment rule."); *id.* ("[T]he mere fact that a director serves on the board of a corporation with a controlling stockholder does not automatically make that director not independent.").

[92] *See, e.g.*, *In re PNB Hldg. Co. S'holders Litig.*, 2006 WL 2403999, at *9 (Del. Ch. Aug. 18, 2006) (analyzing whether a stockholder exercises such formidable voting and

20

whether a majority of the Essendant Board labored under conflicts of interest with respect to the GPC and Sycamore mergers, on the other hand, involves a counting of heads among board members to determine whether the Complaint well pleads that a majority of the Essendant Board was either interested in the transaction(s) or lacked independence.[93]

While Plaintiffs' theories of breach are at sixes and sevens, I address each separately in search of clarity. As I consider the claim that Sycamore dominated and controlled the Essendant Board, I necessarily confront Plaintiffs' allegation that Sycamore owes fiduciary duties to Essendant stockholders as Essendant's controlling stockholder.[94]

### 1. Plaintiffs Have Not Well Pled That Sycamore Was Essendant's Controlling Stockholder

If Plaintiffs had pled facts supporting a reasonable inference that a majority of the Essendant Board was beholden to an interested party, such as a conflicted controlling stockholder, then Count I would state a non-exculpated claim of breach

---

managerial power that, as a practical matter, it is "no differently situated than if [it] had majority voting control.").

[93] *Frederick Hsu Living Trust v. ODN Hldg. Corp.*, 2017 WL 1437308, at *26 (Del. Ch. Apr. 14, 2017).

[94] Compl. ¶¶ 1, 13, 35, 36–37, 61, 111, 115–16.

of fiduciary duty.[95] To be sure, Plaintiffs were mindful of this burden and attempted to carry it by alleging that Sycamore was Essendant's controlling stockholder when the Essendant Board terminated the GPC merger agreement in favor of the Sycamore merger.[96] According to the Complaint, the Essendant Board "cav[ed] to the will of Sycamore" and "fail[ed] to ensure that all conflicts of interest between Sycamore and [Essendant's] non-controlling stockholders were resolved in the best interests of the non-controlling stockholders."[97] If this conclusory allegation were supported by well-pled facts, then the Essendant Board's Motion to Dismiss would have to be denied.[98] But, as explained below, with no facts to serve as anchor, the conclusory allegations of domination and control drift over the falls.

Under Delaware law, a stockholder is a "controlling stockholder" only if it (1) "owns more than 50% of the company's voting power" or (2) "owns less than 50% of the voting power of the corporation but *exercises control* over the business

---

[95] *See Parnes v. Balley Entm't Corp.*, 1997 WL 257435, at *2 (Del. Ch. May 12, 1997) (stating that a plaintiff may rebut the presumption that a board acted on an informed basis, in good faith and in the honest belief that the action was taken in the best interest of the company by showing that "a majority of [the company's] directors lacked independence" because they were "dominated and controlled" by an interested party).

[96] Compl. ¶ 115.

[97] Compl. ¶ 111(a), (e).

[98] *Cornerstone*, 115 A.3d at 1179–80 ("[A] plaintiff can survive a motion to dismiss by [a] director defendant by pleading facts supporting a rational inference that the director . . . acted to advance the self-interest of an interested party from whom they could not be presumed to act independently[.]").

affairs of the corporation."[99]  Plaintiffs acknowledge Sycamore owned less than 12%

of Essendant's common stock.[100]  Indeed, Sycamore was only Essendant's third-

largest stockholder.[101]  Thus, Plaintiffs are obliged to plead facts that allow a

reasonable inference that Sycamore "exercise[d] such formidable voting and

managerial power that, as a practical matter, it [was] no differently situated than if it

had majority voting control."[102]  In other words, upon reading the Complaint, the

Court must be able to conclude it is reasonably conceivable that Sycamore's

minority stake was "so potent that independent directors [could not] freely exercise

their judgment, fearing retribution" from Sycamore.[103]  For obvious reasons, the test

---

[99] *In re KKR Fin. Hldgs. LLC S'holder Litig.*, 101 A.3d 980, 991 (Del. Ch. 2014) (emphasis in original).

[100] Compl. ¶ 10.

[101] *See* Essendant Inc., Proxy Statement (Schedule 14A) 61 (Apr. 13, 2018) (showing 13.46% and 12.9% blocks held by Pzena Investment Management, LLC and Blackrock, Inc., respectively, as of the spring of 2018).

[102] *In re Morton's Rest. Gp., Inc. S'holders Litig.*, 74 A.3d 656, 665 (Del. Ch. 2013) (internal citations and quotations omitted); *In re PNB Hldg.*, 2006 WL 2403999, at *9.

[103] *See In re Morton's*, 74 A.3d at 665. *See also In re KKR Fin.*, 101 A.3d at 992–91 (holding that to be deemed a controller, a minority stockholder must have "the ability to dominate the corporate decision-making process" by controlling the board of directors generally or with respect to the particular transaction that is being challenged); *Basho Techs. Holdco, B LLC v. Georgetown Basho Inv'rs, LLC*, 2018 WL 3326693, at *26 (Del. Ch. July 6, 2018) (noting that a plaintiff can show a minority blockholder's domination and control in a variety of ways including personal relationships with board members, contractual rights, commercial relationships, *de facto* ability to remove directors or the company's own characterizations of the minority blockholder's influence); *Frontfour Capital Gp. LLC v. Taube*, 2019 WL 1313408, at *2 (Del. Ch. Mar. 11, 2019) (involving coercive contractual rights that prevented other bidders from engaging and a

23

for freighting a minority stockholder with the fiduciary obligations of a controlling stockholder "is not an easy one to satisfy."[104]

Sycamore did not (i) nominate any members of the Essendant Board, (ii) wield coercive contractual rights, (iii) maintain personal relationships with any of the Essendant Board members, (iv) maintain any commercial relationships with Essendant that would afford leverage in its negotiations, (v) threaten removal, challenge or retaliate against any of the Essendant Board members or (vi) otherwise exercise "outsized influence" in Essendant's Board room.[105] Indeed, it would have been difficult for Sycamore to achieve any of these markers of control because, as noted, two other entities held larger voting blocks than Sycamore.[106]

---

special committee personally beholden to a minority stockholder); *Calesa Assoc. v. Am. Capital Ltd.*, 2016 WL 770251, at *10 (Del. Ch. Feb. 29, 2016) (involving, among other factors, a majority of a board having personal relationships with the minority blockholder); *In re Zhongpin Inc. S'holders Litig.*, 2014 WL 6735457, at *7 (Del. Ch. Nov. 26, 2014), *rev'd*, 115 A.3d 1173 (Del. 2015) (involving a corporation's own public filings stating that "Our largest shareholder has significant influence over our management and affairs.").

[104] *In re PNB Hldg.*, 2006 WL 2403999, at *9.

[105] *See Basho*, 2018 WL 3326693, at *26 (collecting examples of actual control factors).

[106] *See* Essendant Inc., Proxy Statement (Schedule 14A) 61 (Apr. 13, 2018) (showing 13.46% and 12.9% blocks held by Pzena Investment Management, LLC and Blackrock, Inc., respectively, as of the spring of 2018). *See also Hokanson v. Petty*, 2008 WL 5169633, at *8 (Del. Ch. Dec. 10, 2008) (noting that even the company's "largest holder" will not be deemed a controller absent majority ownership or indicia of domination and control).

In support of their controlling stockholder allegations, Plaintiffs make much of an unpublished decision from the Circuit Court for Montgomery County Maryland, *In re American Capital*, which purported to apply Delaware law in a controlling stockholder analysis.[107]  There, the court found a hedge fund with less than 12% ownership exercised actual control over a board's decision to pursue an ill-advised sale of the company.  I need not predict how a Delaware court would have resolved the dispute in *In re American Capital* to discern that the decision does not help Plaintiffs here.  The case is distinguishable on its facts.  The alleged controller in *American Capital* was so extensively involved with the board's negotiation of the challenged transaction that it was able to extract from the target a non-pro-rata $3 million "reimbursement" for its negotiation expenses when the deal closed.[108]  No such facts have been pled here.

After carefully reviewing the Complaint, I am satisfied Plaintiffs have not well pled that Sycamore was Essendant's controlling stockholder.  The consequences of that failure are two-fold.  *First*, the Essendant Board cannot be held to answer for alleged breaches of fiduciary duty based on allegations that its members caved to the will of the controller.  *Second*, Sycamore is not a fiduciary

---

[107] *In re Am. Capital S'holder Litig.*, No. 422598-V, 2017 Md. Cir. Ct. LEXIS 4, at *8, *42–45 (Montgomery Cty. Md. Cir. Ct. July 12, 2017) (unavailable on Westlaw).

[108] *Id.*

owing duties to Essendant stockholders and cannot, therefore, be held to answer for breaches of duties it did not owe.

### 2. Plaintiffs Have Not Well Pled Board Level Conflicts

Tellingly, the Complaint mentions the individual Essendant Board members by name only *once*, and that is when it rotely identifies the party Defendants.[109] Beyond this cursory reference, Plaintiffs have made no effort to "count heads," meaning they have not undertaken to plead a factual basis upon which the Court could undertake a "director-by-director analysis" of interestedness or lack of independence.[110] The best Plaintiffs can muster in opposition to the Motion to Dismiss are allegedly "unusual facts regarding the discussions and interactions between Sycamore and [unnamed] Essendant[] representatives" that they claim evidence Sycamore's "significant influence over [the Essendant Board]."[111] These allegations fall well short of rebutting the presumption of independence that each member of the Essendant Board enjoys.[112]

---

[109] Compl. ¶¶ 18–26.

[110] *Frederick Hsu*, 2017 WL 1437308, at *26. Indeed, Plaintiffs acknowledge there is no basis to contend the Essendant Board was interested in either the GPC or Sycamore mergers. *See* Pls.' Omnibus Br. in Opp'n to all Defs.' Mots. to Dismiss the Compl. ("POB") (D.I. 20) 48 (acknowledging that "Plaintiffs have not alleged that [the Essendant Board] had personal motivations for favoring Sycamore.").

[111] Compl. ¶ 12.

[112] *Beam v. Stewart*, 845 A.2d 1040, 1051 (Del. 2004).

*First*, the Complaint contains no facts supporting an inference that the Sycamore merger was "highly unusual" when compared with other transactions.[113] There is simply no basis in the Complaint to draw any comparisons—one way or the other.

*Second*, Plaintiffs do not allege any improper relationship or tie between individual members of the Essendant Board and Sycamore. Instead, to support an inference that the members of the Essendant Board lacked independence, Plaintiffs point to the Essendant Board's: (i) decision not to inform GPC of the April 9 phone call with Phillips, (ii) indication to Sycamore that it would be open to considering a revised offer, (iii) failure to "require Sycamore" to sign a standstill agreement,[114] (iv) slow-walking the GPC merger's regulatory approval process in order to facilitate negotiations with Sycamore[115] and (v) ultimate decision that the Sycamore

---

[113] Compl. ¶ 12.

[114] It is unclear how the lack of a standstill agreement is relevant given that the Essendant Board adopted a poison pill on May 17—shortly after Sycamore began acquiring Essendant's shares on the open market. *See* Essendant 14D-9 at 20. Apparently, Sycamore's "control" over Essendant and its Board was temporarily disabled when the Essendant Board decided to adopt this defensive measure in response to the perceived threat from Sycamore.

[115] As I note elsewhere in this opinion, my willingness to draw plaintiff-friendly inferences at this stage on this record does *not* mean that I am deciding, for example, that Essendant did not use its reasonable best efforts to consummate the GPC merger agreement. *See* Compl. ¶ 57. The resolution of that question remains for another day in another action.

merger was preferable to the GPC merger.[116]  At base, none of these "facts" support an inference that a majority of the Essendant Board was beholden to Sycamore. Instead, at best, the allegations support an inference that the Essendant Board did exactly what it said it would do.  That is, it chose a cash transaction with Sycamore rather than a stock deal with GPC—a judgment call well within a board's prerogative when pursuing the "highest value reasonably available to the [Essendant] shareholders."[117]

The Essendant Board's preference for a cash deal does not support an inference that it was interested in the Sycamore merger or that it somehow lacked independence.  Delaware law empowers directors to consider whether, under the circumstances, "stock or other non-cash consideration" is preferable to cash when evaluating a proposal.[118]  The Complaint acknowledges that Citi's pro forma DCF valuation of the GPC stock deal (i.e., $13.30 to $23.90 per share) included a synergies range of $8.35 to $11.25.[119]  When compared with Sycamore's initial cash offer of $11.50 and Final Proposal of $12.80 per share, it is not reasonable to infer

---

[116] Compl. ¶ 12.

[117] *Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1156, 1176 (Del. 1995); Essendant 14D-9 at 27 (noting that the GPC merger was less attractive because of, among other risks, "continued secular decline in the Company's industry.").

[118] *Paramount Commc'ns Inc. v. QVC Network Inc.*, 637 A.2d 34, 44 (Del. 1994).

[119] Compl. ¶ 70.

28

that the Essendant Board's preference for the Sycamore deal, even when considering GPC's revised offer with a contingent value right,[120] was so "unusual" or "inexplicable" that it reflects a breach of the duty of loyalty.[121]

The only factual allegation that possibly relates to Essendant Board members' interestedness is that "certain executive officers and directors of [Essendant]" had "possible ongoing roles" with Staples.[122] This type of vague allegation cannot support an inference of disloyalty given our law's presumption of directorial independence.[123]

In sum, based on the facts alleged, it is not reasonably conceivable that a majority of the Essendant Board was interested in either the GPC or Sycamore mergers or lacked independence. Without a factual predicate to question the loyalty of these fiduciaries, the Complaint fails to support a reasonable inference that a non-exculpated breach of fiduciary duty has occurred here.

---

[120] Compl. ¶ 71.

[121] Compl. ¶¶ 13, 72, 80. Here again, I emphasize that while the Essendant Board's choice, as pled, does not support a breach of loyalty claim as a matter of fiduciary duty law, I do not decide the ultimate superiority (or inferiority) of the Sycamore merger compared with the GPC merger or whether the Essendant Board's decision to terminate the GPC merger agreement breached that agreement. *See PWP Xerion Hldgs. III LLC v. Red Leaf Res., Inc.*, 2019 WL 5424778, at *15 (Del. Ch. Oct. 23, 2019) ("The two legal frameworks [for breach of contract and breach of fiduciary duty] are separate.").

[122] Compl. ¶ 104.

[123] *See Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984), *rev'd on other grounds, Brehm v. Eisner*, 746 A.2d 244 (Del. 2000).

29

### 3. Plaintiffs Have Not Well Pled Bad Faith

When, as here, a board decides to sell the corporation it manages, "[it] must perform its fiduciary duties in the service of a specific objective: maximizing the sale price of the enterprise."[124] When pursuing this objective, while "there is no single path," the board must "act in a neutral manner to encourage the highest possible price for shareholders."[125] Against the backdrop of Essendant's 102(b)(7) provision, and having dispensed with Plaintiffs' allegations that the Essendant Board acted in service of Sycamore's interests at the expense of other Essendant stockholders, Plaintiffs are left with a claim that Essendant's fiduciaries "acted in bad faith" in their pursuit of the best value-maximizing transaction.[126] Here again, the Complaint falls short.

A director acts in bad faith when she "intentionally fails to act in the face of a known duty to act, demonstrating a conscious disregard for . . . her duties."[127] Plaintiffs allege the Essendant Board took two actions in bad faith. *First,* it is alleged

---

[124] *In re Answers Corp. S'holders Litig.*, 2012 WL 1253072, at *6 (Del. Ch. Apr. 11, 2013) (citing *Lyondell Chem. Co. v. Ryan*, 970 A.2d 235, 239 (Del. 2009) (internal quotations omitted)).

[125] *Barkan v. Amsted Indus. Inc.*, 567 A.2d 1279, 1286 (Del. 1989); *In re Smurfit-Stone Container Corp. S'holder Litig.*, 2011 WL 2028076, at *16 (Del. Ch. May 20, 2011).

[126] *Cornerstone*, 115 A.3d at 1179–80.

[127] *Lyondell*, 970 A.2d at 243.

the Essendant Board "misled stockholders" by causing "materially incomplete and misleading" information to be filed with the SEC.[128] *Second*, Plaintiffs allege the fact that the Sycamore merger "inadequately compensated Essendant stockholders for their shares" is somehow indicative of board-level bad faith.[129] I address each allegation in turn.

### a. No Bad Faith Disclosures

The fiduciary duty of disclosure is a "subset" of the duties of loyalty and care.[130] Directors of a Delaware corporation must disclose "fully and fairly all material information within the board's control when it seeks shareholder action."[131] In this case, however, to plead a non-exculpated disclosure claim, Plaintiffs are obliged to do more than allege "erroneous judgment" regarding the "proper scope and content" of a disclosure.[132] Instead, to plead a breach of the duty of loyalty in

---

[128] Compl. ¶¶ 92, 97.

[129] Compl. ¶ 89.

[130] *Crescent/Mach I P'rs, L.P. v. Turner*, 846 A.2d 963, 987–88 (Del. Ch. 2000).

[131] *Malone v. Brincat*, 722 A.2d 5, 12 (Del. 1998).

[132] *Crescent/Mach I*, 846 A.2d at 987; *McMillan v. Intercargo Corp.*, 768 A.2d 492, 507 (Del. Ch. 2000) (dismissing a claim for failure to state a non-exculpated claim when the complaint did not allege facts "from which one can reasonably infer that any [alleged] omission resulted from *more than a mistake* about what should have been disclosed") (emphasis supplied).

this context, Plaintiffs must allege a knowing or intentional misstatement or omission of a material fact.[133]  In my view, they have not come close to this mark.

*First*, the Complaint fails to plead any facts that would allow an inference that the alleged omitted facts and misstatements "meet the materiality standard."[134] *Second*, the conclusory suggestion that the Essendant Board was intentionally misleading stockholders to tender into the Sycamore merger lacks any factual narrative that would allow any inferential explanation of *why* these fiduciaries would so abandon their duties as to engage in bad faith.[135]  *Third*, the alleged omissions are merely examples of either the Essendant Board declining to adopt Plaintiffs' characterization of its behavior (i.e. "self-flagellation") or making business decisions, whether right or wrong, in an effort to maximize stockholder value.[136]

---

[133] *Crescent/Mach I*, 846 A.2d at 987.

[134] *In re BioClinica, Inc. S'holder Litig.*, 2013 WL 5631233, at \*8–9 (Del. Ch. Oct. 16, 2013).  In their opposition brief, Plaintiffs cite *Morrison v. Berry*, 191 A.3d 268, 275 (Del. 2018), for the proposition that "troubling facts regarding director behavior" during a sales process are material to stockholders and must be disclosed.  POB 30.  The facts in *Morrison*, however, bear no resemblance to the pled facts here.  In *Morrison*, a board failed to tell its stockholders that a major stockholder told the board he would sell all his stock unless the board consummated a transaction with a specific merger partner.  *Id.* at 286. Unlike the heavy hand the stockholder in *Morrison* used to influence the board, the Complaint pleads no facts that would support an inference that Sycamore engaged in similar tactics in connection with the Sycamore merger.

[135] *Aronson*, 473 A.2d at 812 (describing the business judgment rule as, among other things, a "presumption" of good faith).

[136] For example, Plaintiffs argue the Essendant Board should have disclosed that it intentionally slow-walked the GPC merger's regulatory approval process in order to delay consummation of that transaction.  That sort of self-flagellation is not required in

*Finally*, Plaintiffs' allegations that the disclosures lacked certain details, like the exact amount of Citi's post-closing compensation, the exact date management projections were calculated or details on Essendant executives' post-closing employment, cannot support an inference of bad faith.[137]

---

disclosures to stockholders. *Loudon v. Archer-Daniels-Midland Co.*, 700 A.2d 135, 143 (Del. 1997) ("The directors' duty of disclosure does not oblige them to characterize their conduct in such a way as to admit wrongdoing. [In other words], a board is not required to engage in 'self-flagellation' . . .") (citation omitted). Stockholders were apprised of the regulatory challenges associated with the GPC merger. They could decide for themselves whether the delays in obtaining regulatory approval justified a vote against the Sycamore merger. Likewise, the Essendant Board's alleged invitation to Sycamore to submit a revised offer reflects, at best, nothing more than a negotiating strategy employed by the Essendant Board to coax a better offer and is the sort of "blow-by-blow description" that this court regularly finds immaterial in the disclosure context and certainly lacking as an indicator of bad faith. *See, e.g.*, *Kahn v. Stern*, 2017 WL 3701611, at *16 (Del. Ch. Aug. 28, 2017) (collecting cases). *See* Compl. ¶¶ 95–96. While not indicative of bad faith, whether this conduct resulted in a breach of the GPC merger agreement, again, remains to be seen.

[137] *See, e.g.*, *In re BioClinica*, 2013 WL 5631233, at *9 (holding that Delaware law "does not require such detailed disclosure" as "why [directors] adjusted their estimates for capital expenditures" or why "certain inputs" such as selections of EBITDA ranges were used in a fairness opinion). Instead, directors have a duty to disclose a "fair summary" of the inputs and procedure used to construct the fairness opinion; *In re Rouse Props., Inc.*, 2018 WL 1226015, at *24 (Del. Ch. Dec. 14, 2018) (holding that a board met its disclosure obligations about its financial advisor by disclosing that its banker "has provided, currently is providing and may in the future provide investment banking, commercial banking and other financial services to [buyer] for which it has received and may receive compensation") (internal quotation omitted); *Kahn*, 2017 WL 3701611, at *16 (finding that the board's failure to disclose why it entered into certain "side deals" and the play-by-play negotiation of the deals fell "well short of implying bad faith"). As for Essendant executives' post-closing employment, the Complaint acknowledges that Essendant *did* disclose that some executives had "possible ongoing roles" with Staples. Compl. ¶ 104. Moreover, the Schedule 14D-9 specifically disclosed that there were "no employment, equity contribution or other agreement[s], arrangement[s] or understanding[s]" between management and Sycamore. *See* Essendant 14D-9 at 14. "Directors do not have an obligation to disclose information about the *non-existence* of misaligned incentives."

33

Plaintiffs' argument that the Essendant Board created a false impression "that there was some newly-discovered, significant risk of gaining FTC approval for the GPC [merger]" is unsupported by the facts as alleged.[138]  The Complaint alleges Essendant's Recommendation Statement simply disclosed that one of the factors the Essendant Board considered in recommending the Sycamore merger was the relative "risk[] of execution" related to regulatory approval of each transaction under consideration.[139]  Even as described in the Complaint, Essendant did not tell stockholders, directly or indirectly, that there was any specific "new" or increased regulatory risk associated with the GPC merger as compared to the Sycamore merger.[140]  And even if Essendant's disclosures could be read to create such an impression, that is a far cry from implying bad faith.[141]

The same can be said of Plaintiffs' allegations that the Recommendation Statement "caused Essendant stockholders to incorrectly believe that all stockholder

---

*IRA Trust FBO Bobbie Ahmed v. Crane*, 2017 WL 7053964, at *21 (Del. Ch. Dec. 11, 2017, revised Jan. 26, 2018).

[138] Compl. ¶ 99.

[139] Compl. ¶ 98.

[140] Compl. ¶¶ 99–100.

[141] *See McMillan*, 768 A.2d at 507 (dismissing bad faith disclosure violations where one cannot "reasonably infer that any [] omission resulted from more than a mistake about what should have been disclosed").

[legal] actions challenging the [Sycamore merger] had been dismissed."[142]   Again, even as described in the Complaint, the Recommendation Statement merely "stated that Plaintiff's federal securities action 'was voluntarily dismissed[.]'"[143]  Even after drawing inferences in Plaintiffs' favor, this affirmative statement cannot reasonably be read to imply anything about the entire universe of actions challenging the Sycamore merger, even assuming, which I doubt, that such information would have been important to stockholders in deciding whether to tender into the Sycamore merger.

### b. No Bad Faith Deal Process

Plaintiffs' process-related allegations of bad faith are likewise deficient.  In the context of a sale of corporate control, bad faith is qualitatively different from "an inadequate or flawed effort" to obtain the highest value reasonably available for a corporation.[144]  Absent direct evidence of an improper intent, a plaintiff must point to "a decision [that] lacked any rationally conceivable basis" associated with maximizing stockholder value to survive a motion to dismiss.[145]

---

[142] Compl. ¶ 106.

[143] *Id.*

[144] *Lyondell*, 970 A.2d at 243.

[145] *Chen v. Howard-Anderson*, 87 A.3d 648, 684 (Del. Ch. 2014).

To begin, Plaintiffs' references to alleged breaches of the GPC merger agreement do not implicate bad faith, at least not in the fiduciary duty context. Indeed, "[e]ven with an iron-clad contractual obligation, there remains room for fiduciary discretion because of the doctrine of efficient breach."[146] A board may even have a duty to breach a contract if it determines that the "benefits [of breach] (broadly conceived) exceed the costs (broadly conceived)."[147] Thus, in the absence of well-pled allegations that the Essendant Board breached the GPC merger agreement for no reason,[148] the breach of that contract cannot serve as a factual predicate to support a non-exculpated breach of fiduciary duty claim.[149]

---

[146] *Frederick Hsu*, 2017 WL 1437308, at *24.

[147] *Id.* (citing *Orban v. Field*, 1997 WL 153831, at *9 (Del. Ch. Apr. 1, 1997) ("Certainly in some circumstances a board may elect (subject to the corporation's answering in contract for damages) to repudiate a contractual obligation where to do so provides a net benefit to the corporation.")).

[148] *Cf.* Essendant 14D-9 at 27 (explaining the Essendant Board's determination that Sycamore's cash deal was preferable because of "continued secular decline in the Company's industry").

[149] *See PWP*, 2019 WL 5424778, at *15 ("The two legal frameworks" for breach of fiduciary duty and breach of contract "are separate. A board can readily comply with its fiduciary duties while making a decision that breaches a contract just as a board could opt to comply with a contract under circumstances where its fiduciary duties would call for engaging in efficient breach."); *Frederick Hsu*, 2017 WL 1437308, at *24 ("[A] board of directors may choose to breach [a contract] if the benefits (broadly conceived) exceed the costs (again broadly conceived)."); *In re Tyson Foods, Inc.*, 919 A.2d 563, 601 (Del. Ch. 2007) ("A director might well breach a contract without violating any fiduciary duty."); *In re Coleman Co. Inc. S'holders Litig.*, 750 A.2d 1202, 1206 n.9 (Del. Ch. 1999) (observing that whether or not a merger agreement has a fiduciary out, fiduciaries have "the practical option of effectuating an efficient breach").

Plaintiffs' remaining process-related allegations similarly fail to conjure the "extreme set of facts" necessary to support an inference that the Essendant Board acted in bad faith.[150] The Complaint claims the $12.80 per share price was "unfair" because it (i) represented a discount to Essendant's GPC merger-affected trading price and (ii) was below the discounted cash flow range Citi calculated for the GPC merger on a *pro forma* basis.[151] Even accepting these critiques at face value, criticizing the price at which a board agrees to sell a company, without more, does not a bad a faith claim make.[152]

---

[150] *Lyondell*, 970 A.2d at 243 (citation omitted).

[151] Compl. ¶¶ 14, 61, 84, 86.

[152] *See In re CompuCom Sys. Inc. S'holders Litig.*, 2005 WL 2481325, at *7 (Del. Ch. Sept. 29, 2005) (dismissing *Revlon* claims stating, "Nor is the fact that the final price per share was below the market price on the day of sale enough to rebut the business judgment presumption."); *In re Comverge, Inc. S'holders Litig.*, 2014 WL 6686570, at *13 (Del. Ch. Nov. 25, 2014) (citation omitted) (dismissing bad faith claims under *Revlon* based on a board's agreement to a merger price 7.4% below the unaffected stock price). While the court in *Comverge* refused to dismiss a breach of fiduciary duty claim based on an onerous deal protection creating a combined termination fee of up to 13%, Plaintiffs make no similar allegations here. *Id.*, at *15–17. And it bears repeating that the Final Offer represented a 51% premium to Essendant's unaffected price. *See* Essendant 14D-9 at 28. The decision to accept this cash transaction, while perhaps a breach of the GPC merger agreement, is, nevertheless, imminently explicable as a measured determination that a cash payment *today* is superior to uncertain returns derived from remaining in the highly-competitive office supply business *tomorrow*. *See In re Fort Howard Corp. S'holders Litig.*, 1988 WL 83147, at *14 (Del. Ch. Aug. 8, 1988) ("[A] disinterested board might prefer [an all cash deal] to a deal that may be thought to represent a somewhat higher price, but is not all cash.").

Plaintiffs also allege the Essendant Board should have negotiated a standstill agreement or put a poison pill in place to create a more level playing field before Sycamore acquired its toehold.[153] At oral argument, Plaintiffs' counsel also made much ado about the Essendant Board's determination that Sycamore's Proposal 2 was reasonably likely to lead to a superior proposal after it had rejected Proposal 1 (at the same price).[154] Plaintiffs suggest the Essendant Board should have either (i) used the Sycamore proposals to negotiate a higher price with GPC or (ii) required Sycamore to sign a confidentiality agreement before determining Proposal 2 was reasonably likely to lead to a superior proposal.[155]

The Essendant Board responds, not surprisingly, by reiterating that the standard for bad faith is *intentional* failure or a *conscious* disregard of the duty to seek the highest price reasonably available.[156] They also point out that, after rejecting Proposal 1, the Essendant Board had effectively communicated that $11.50 per share ("full stop") was not going to be enough.[157] As a result, the Essendant Board's willingness to pursue Proposal 2 came with the understanding that

---

[153] Compl. ¶ 12.

[154] Oral Arg. Tr. 62–63 (D.I. 39).

[155] *Id.*

[156] *Lyondell*, 970 A.2d at 243.

[157] Oral Arg. Tr. 49.

Sycamore would have to improve its offer after diligence.[158]  How this fits with Essendant's contractual obligations to GPC remains to be seen.  From a fiduciary perspective, however, this negotiating sequence falls well within the many available "blueprint[s]" a board might choose to employ while negotiating a transaction within the *Revlon* paradigm.[159]

As for Plaintiffs' argument that the Essendant Board should have negotiated a standstill sooner, the Essendant Board's prompt decision to put a rights plan in place mitigates any delay in negotiating a standstill.[160]  Because of the poison pill, Sycamore could not become Essendant's largest (or even second largest) stockholder.[161]  Thus, like Plaintiffs' other process-related claims, their "uneven playing field" narrative does not support a well-pled claim of bad faith.

---

[158] *Id.*

[159] *In re Rural Metro Corp.*, 88 A.3d 54, 89 (Del. Ch. 2014) (internal quotation omitted).

[160] Essendant Inc., Current Report (Form 8-K) (May 17, 2018) (announcing adoption of rights plan and amendment to Articles of Incorporation).

[161] *See* Essendant Inc., Proxy Statement (Schedule 14A) 61 (Apr. 13, 2018) (showing 13.46% and 12.9% blocks held by Pzena Investment Management, LLC and Blackrock, Inc., respectively, as of the spring of 2018).  And, again, the adoption of the poison pill in response to a perceived threat from Sycamore is difficult to square with Plaintiffs' suggestion that the Essendant Board was so smitten with Sycamore that its members were willing to engage in bad faith vis-à-vis Essendant's stockholders.

### 4. Plaintiffs Have Not Well Pled that Phillips Breached His Fiduciary Duties as CEO (Count I)

Because Section 102(b)(7) does not exculpate a corporate officer's breach of fiduciary duty, Plaintiffs' claims against Phillips as Essendant's CEO face a different standard.[162] Plaintiffs need only plead facts supporting a reasonable inference that Phillips breached his fiduciary duty of care in his official capacity as CEO to state a viable claim against him.[163] Even so, they must clearly draw the distinction between exculpated claims (due care claims relating to Phillips' conduct as Essendant Board member) and non-exculpated claims (those relating specifically to his role as CEO).[164] To the extent the Complaint attempts to state a claim against Phillips in his capacity as a member of the Essendant Board, the Complaint fails for reasons stated above. That leaves Phillips' conduct in his capacity as an Essendant officer.

The Complaint mentions only one act taken by Phillips in his official capacity as CEO: his participation in a telephone call on April 9, 2018, where he allegedly

---

[162] *See Amalgamated Bank v. Yahoo! Inc.*, 132 A.3d 752, 787 (Del. Ch. 2016) ("Section 102(b)(7) does not authorize exculpation for officers . . . in [their] capacity as [] officer[s]."); *id* (holding that even if a complaint fails to state a non-exculpated claim against an executive director, "[t]here is also the possibility of a claim against [Phillips] in [his] capacity as an officer [because] Section 102(b)(7) does not authorize exculpation for officers.").

[163] *Id.*

[164] *See Arnold v. Soc'y for Savings Bancorp, Inc.*, 650 A.2d 1270, 1288 (Del. 1994) (affirming rejection of plaintiff's fiduciary duty claims against officer because "plaintiff has failed to highlight any specific actions [the officer] undertook as officer (as distinct from actions as a director)").

learned of Sycamore's interest in acquiring Essendant.[165]  It is difficult to discern how fielding a telephone call during which an unsolicited acquisition proposal is communicated, without more, can support a reasonably conceivable inference of a breach of the duty of care or loyalty.[166]  Even if this conversation somehow breached the GPC merger agreement as Plaintiffs suggest,[167] that does not *ipso facto* or *ipso jure* amount to a breach of fiduciary duty.[168]

---

[165] Compl. ¶¶ 2, 12 ("Sycamore contacted . . . Phillips about acquiring [Essendant.]"  But "Essendant did not inform GPC that Sycamore called [] Phillips prior to the signing of the GPC Merger Agreement.").

[166] All the Complaint alleges is that Phillips answered his phone, had a conversation with a Sycamore representative and then reported the substance of the conversation to the Essendant Board. Compl. ¶¶ 2 ("Sycamore contacted . . . Phillips about acquiring the Company."), 12 ("Essendant did not inform GPC that Sycamore called Mr. Phillips."). As for his official actions as Essendant's CEO, that is the sum and substance of the allegations.  Indeed, as Plaintiffs' counsel has conceded, "that phone call alone, is that enough [to constitute a breach of fiduciary duty], I would say no, of course not."  Oral Arg. Tr. 58.

[167] Compl. ¶ 6 ("In violation of the GPC Merger Agreement, the [Essendant Board] initially concealed the Sycamore proposal from GPC[.]").  In this regard, I note the alleged phone call took place before the Essendant Board signed the GPC merger agreement.

[168] *PWP*, 2019 WL 5424778, at *15 ("A [fiduciary] can readily comply with [his] fiduciary duties while making a decision that breaches a contract[.]"); *Frederick Hsu*, 2017 WL 1737308, at *24; *In re Tyson*, 919 A.2d at 601 (A fiduciary "might well breach a contract without violating any fiduciary duty."); *In re Coleman*, 750 A.2d at 1206 n.9 (Fiduciaries always have "the practical option of effectuating an efficient breach[.]").

### 5. Plaintiffs Have Not Well Pled that the Essendant Board Aided and Abetted Sycamore's Breach of Fiduciary Duty (Count IV)

Because Plaintiffs failed adequately to plead that Sycamore was Essendant's controlling stockholder, it is not reasonably conceivable that Sycamore owed fiduciary duties to the Essendant stockholders. Consequently, the Essendant Board could not have aided and abetted a breach of Sycamore's non-existent fiduciary duties. Plaintiffs' Count IV must be dismissed.[169]

### 6. Plaintiffs Have Not Pled Facts Supporting a Reasonable Inference the Essendant Board Committed Waste (Count V)

In Count V, Plaintiffs allege the Essendant Board committed waste by (i) signing the GPC merger agreement "knowing at the time that Sycamore was interested in acquiring Essendant" and (ii) agreeing to a $12 million termination fee "knowing that such a termination fee would be triggered in the event they terminated the GPC merger agreement."[170] In short, Plaintiffs' waste allegations are that the Essendant Board was sloppy when it signed the GPC merger agreement (which included a termination fee) before considering Sycamore's offer.

---

[169] *See In re Volcano Corp. S'holder Litig.*, 143 A.3d 727, 750 (Del. Ch. 2016) (Absent an underlying breach, an aiding and abetting claim should be "summarily" dismissed.).

[170] Compl. ¶¶ 128–33.

To state a claim for waste, Plaintiffs must plead that the Sycamore merger "cannot be attributed to any rational business purpose."[171] In other words, Plaintiffs must plead facts that allow a reasonable inference that the Sycamore merger amounted to "a transfer of corporate assets that serves no corporate purpose[,] or for which no consideration at all is received."[172] Plaintiffs cannot meet this standard.

*First,* when Sycamore first expressed interest in acquiring Essendant, the Essendant Board had no way of knowing the true level of Sycamore's interest. It is not waste for a board to sign a merger agreement with one party after another party makes an overture of hypothetical interest.[173] *Second*, and more broadly, that Plaintiffs felt some need to tack on a waste claim, given the likely outcome of their effort to plead non-exculpated breaches of fiduciary duties, does not excuse them from the burden to state a reasonably conceivable claim. Necessity is not always the mother of invention. Again, the Sycamore merger offered a 51% premium to Essendant's unaffected stock price.[174] The Essendant Board made a business

---

[171] *Volcano*, 143 A.3d at 750 (quoting *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1993)).

[172] *Protas v. Cavanagh*, 2012 WL 1580969, at *9 (Del. Ch. May 4, 2012) (alteration in original; citation and quotation omitted).

[173] In other words, such a decision is not a choice that "no business person of ordinary, sound judgment could [make.]" *Id.*

[174] *See* Essendant 14D-9 at 28.

decision that the office supply industry would face challenging headwinds in the years to come that made the cash transaction, in their eyes, more attractive than GPC's stock offer.[175]  This decision, right or wrong, was not one lacking in any corporate purpose.[176]  Thus, it is not fodder for a viable waste claim.

## B. Plaintiffs Fail To State a Claim Against Sycamore and Staples (Counts II and III)

In Count II, Plaintiffs allege Sycamore was Essendant's controlling stockholder.[177]  As discussed above, based on the pled facts, it is not reasonably conceivable that Sycamore was a controller.  This leaves only Count III against Sycamore, Staples, Egg Parent Inc. and Egg Merger Sub Inc. (collectively, the "Sycamore Defendants") for aiding and abetting the Essendant Board's breaches of fiduciary duties.[178]

To plead a claim for aiding and abetting a breach of fiduciary duty, a plaintiff must allege "(1) the existence of a fiduciary relationship; (2) the fiduciary breached its duty; (3) a defendant, who is not a fiduciary, knowingly participated in a breach; and (4) damages to the plaintiff resulted from the concerted action of the fiduciary

---

[175] *Id.* at 27–28.

[176] *Protas*, 2012 WL 1580969, at *9.

[177] Compl. ¶¶ 114–17.

[178] Compl. ¶¶ 118–22.

and the nonfiducairy."[179]   "The standard for an aiding and abetting claim is a stringent one, one that turns on proof of scienter of the alleged abettor."[180]

If a plaintiff cannot plead an underlying breach of fiduciary duty, it likewise cannot plead a claim for aiding and abetting.[181]   In this regard, I have already determined that Plaintiffs have failed to plead viable breach of fiduciary duty claims against the Essendant Board.   But that determination was in the context of, and informed by, Essendant's Section 102(b)(7) charter provision; in other words, the focus was on whether the Complaint contained well-pled allegations of a loyalty breach.[182]   There remains a possibility that Plaintiffs have well pled a breach of the Essendant Board's *Revlon* duties flowing from the duty of care—a breach that could (hypothetically) give rise to aiding and abetting liability on the part of the Sycamore Defendants notwithstanding exculpation.[183]   Additionally, while some Delaware

---

[179] *Globis P'rs, L.P. v. Plumtree Software, Inc.*, 2007 WL 4292024, at *15 (Del. Ch. Nov. 30, 2007).

[180] *Binks v. DSL.net, Inc.*, 2010 WL 1713629, at *10 (Del. Ch. Apr. 29, 2010).

[181] *Chester Cty. Ret. Sys. v. Collins*, 2016 WL 7117924, at *3 (Del. Ch. Dec. 6, 2016); *In re Gen. Motors (Hughes) S'holder Litig.*, 2005 WL 1089021, at *23 (Del. Ch. May. 4, 2005).

[182] *Malpiede*, 780 A.2d at 1094; *Cornerstone*, 115 A.3d at 1179–80.

[183] *Lyondell*, 970 A.2d at 239 (explaining that a board's duty to "maximize[] the sale price of the enterprise" can implicate both the duty of care and the duty of loyalty); *Singh v. Attenborough*, 137 A.3d 151, 152 (Del. 2016) (analyzing an advisor's duties in advising a board and stating, "To hold that an advisor can only be liable if it aids and abets a non-exculpated breach of fiduciary duty [] [is] erroneous."); *In re Rural Metro*, 88 A.3d at 87–

decisions appear to assume that *Corwin* can cleanse both a board's breach of fiduciary duties and related aiding and abetting liability for non-fiduciaries, Plaintiffs argue that any such extension of *Corwin* is unjustified.[184]

While Plaintiffs pose interesting questions regarding the applicability of *Cornerstone* and *Corwin* in the aiding and abetting context, I need not decide them here. For purposes of my aiding and abetting analysis, I *assume* Plaintiffs have pled non-exculpated and uncleansed breaches of fiduciary by the Essendant Board. Even so, they have not well pled that Sycamore aided and abetted any such breaches. Simply stated, there are no well-pled facts that the Sycamore Defendants "knowingly participated" in the Essendant Board's hypothetical breach.[185] The Complaint lacks any reference to non-conclusory communications between Sycamore and the Essendant Board that would support an inference of concerted activity.[186] Nor does

---

88 (holding that Section 102(b)(7) exculpation does not extend to third-parties who aid and abet a covered director's breach of fiduciary duty).

[184] Oral Arg. Tr. 73 ("*Corwin* does not apply to Sycamore and Staples. It doesn't. Neither does 102(b)(7)."); *but see Volcano*, 143 A.3d at 749 (dismissing aiding and abetting claims after also dismissing fiduciary duty claims against directors under *Corwin*, stating, "An aiding and abetting claim . . . may be summarily dismissed based upon the failure of the breach of fiduciary duty claims against the director defendants.").

[185] *McGowan v. Ferro*, 2002 WL 77712, at *2 (Del. Ch. Jan. 11, 2002) ("Conclusory statements that are devoid of factual details to support an allegation of knowing participation will fall short of the pleading requirement needed to survive a Rule 12(b)(6) motion to dismiss.") (internal quotation omitted).

[186] *See, e.g.*, Compl. ¶ 12 (alleging that Sycamore "had significant influence over [Essendant] and the [Essendant Board]" based on "highly unusual facts."); *FrontFour*, 2019 WL 1313408, at *31 (internal citation omitted); *Volcano*, 143 A.3d at 750 (noting

the Complaint allege facts that would suggest the Essendant Board breached its fiduciary duties in such "an inherently wrongful manner" that Sycamore could not help but know of the breach and then facilitate it by its continued engagement with the Essendant fiduciaries.[187]

Even if the Complaint alleged (which it does not expressly) that Sycamore knew its proposal was inferior to GPC's and that the Essendant Board, nevertheless, was favoring the Sycamore proposal over the GPC proposal, this alone would be inadequate to state an aiding and abetting claim.[188] The Sycamore Defendants did not owe Essendant stockholders a duty "to negotiate terms that benefitted [Essendant] or otherwise [] facilitate a superior transaction [for Essendant]."[189] Reading the Complaint in a light most favorable to Plaintiffs, this was a typical, arm's-length two-step public company merger negotiation.[190] Indeed, after

---

that "knowing participation" requires a showing of "scienter" and that the standard for pleading the "requisite scienter" imposes a "high burden").

[187] *McGowan*, 2002 WL 77712, at *2.

[188] *Id.*, at *4 (dismissing an aiding and abetting claim based on a similar factual predicate).

[189] *Rouse*, 2018 WL 1226015, at *25.

[190] *In re Frederick's of Hollywood, Inc. S'holders Litig.*, 1998 WL 398244, at *3 n.8 (Del. Ch. July 9, 1998) ("[E]vidence of arm's-length negotiation with fiduciaries negates a claim of aiding and abetting, because such evidence precludes a showing that the defendants knowingly participated in the breach by the fiduciaries.").

negotiating with the Essendant Board, Sycamore increased its offer.[191] The fact the Essendant Board preferred Sycamore's cash offer to a stock offer from GPC cannot be laid at Sycamore's feet as supporting an inference that Sycamore somehow aided and abetted the Essendant fiduciaries in making that determination.[192] Counts II and III must be dismissed.

## III. CONCLUSION

For the foregoing reasons, Defendants' Motions to Dismiss must be granted. The Complaint is dismissed with prejudice.

**IT IS SO ORDERED.**

---

[191] Compl. ¶ 14.

[192] Essendant 14D-9 at 27.